The CITY of FLORENCE, a Colorado city; and the City of Canon City, a Colorado city, Objectors–Appellants,

v.

The BOARD OF WATERWORKS OF PUEBLO, Colorado, Applicant–Appellee,

No. 88SA117.

Supreme Court of Colorado, En Banc.

June 11, 1990.

Krassa, Lindholm, Kumli & Madsen, Robert F.T. Krassa, Boulder, for City of Florence.

Law Firm of John A. McDermott, Roger M. Breyfogle and Gary E. Wint, Canon City, for City of Canon City.

Carlson, Hammond & Paddock, John U. Carlson, M. Wray Witten, Denver, and Petersen & Fonda, and William F. Mattoon, Pueblo, for Bd. of Waterworks of Pueblo, Colo.

Justice ROVIRA delivered the opinion of the Court.

The Cities of Florence and Canon City (cities) appeal that portion of the judgment

and decree issued by the water court holding that the retained jurisdiction provision of section 37–92–304(6), 15 C.R.S. (1989), was inapplicable because Pueblo's exchange plan did not involve a change of water right or a plan for augmentation. Under the facts of this case, we believe that the water court correctly interpreted the statute, and, accordingly, affirm the judgment and decree.

I

In the proceedings below Pueblo sought absolute and conditional decrees for appropriations of existing and proposed rights to exchange return flows from transmountain sources so as to use those return flows from foreign water imported to the Arkansas River Basin from the Colorado River Basin.

Pueblo has various water rights which include certain native waters of the Arkansas River and waters imported from the Colorado River basin.[1] Pueblo delivers this transmountain or "foreign" water to the headwaters of the Arkansas River, where it is either stored for later use, or sent down the Arkansas River for immediate use in the city's municipal system.

Return flow from the initial use of this foreign water is returned to the Arkansas River system at various wastewater treatment plants in the Pueblo area. In 1977, Pueblo began a program of exchange, with senior water users who divert downstream from the Pueblo system, which involves releasing return flow attributable to foreign water into the Arkansas River in the Pueblo area, and storing an equivalent amount of native Arkansas river basin water in the upstream reservoirs. Currently, Pueblo is exchanging approximately 3.46 c.f.s. of water.

The water court made comprehensive findings of fact, which provide the basis for its judgment and decree. The water court considered the interests of downstream users and concluded that:

Evidence of water quality measurements demonstrates that the return flows to be exchanged are of a quality and continuity to meet the requirements of use to which senior appropriations downstream of the outfall of the Pueblo Waste Water Treatment Plant have normally been put, in compliance with C.R.S. 37–80–120(3).

The decree requires the State Engineer to continue to "make·such determinations as to the quality, quantity and continuity of the substitute supply as C.R.S. 37–80–120(3) may require in order to protect the existing uses of senior appropriations."

The water court also addressed the concerns of Florence and Canon City, which are located on the part of the Arkansas River where the exchanges will occur. It found that "the exchanges of direct flows proposed by Pueblo will be made against the native flows of water of the Arkansas and will have the direct effect of reducing the flow of the river on the reach where [the cities] are situated." It recognized that this reduced flow could result in increased treatment costs to the cities and accordingly·imposed certain restrictions upon Pueblo's plan. It required that:

[T]he exchange be operated in such a way as not to reduce the flow of the river at the Fremont[2] outfall below a flow rate of 190 c.f.s. This will be sufficient to protect the Fremont Q7–10[3] flows and avoid adverse effect upon the quality of water at the Florence water treatment plant.

The upstream effects of Pueblo's plan were also addressed by the water court. The decree limits the amount of water

1. Pueblo's transmountain rights involve interest in the Ewing, Columbine, Wurtz and Wurtz extension ditches, and the Busk–Ivanhoe System. They also have an interest in the Twin Lakes Reservoir and Canal Company.

2. Both Florence and Canon City are entirely within the Fremont County Sanitation District. All of the return flow from water supplied to this district, other than outdoor uses, is collect-

ed in a sanitary sewer system and delivered to the Fremont wastewater treatment plant.

3. "Q7–10" is the average seven-consecutive-day low flow expected to occur once in ten years, both annually and for certain seasons. This factor is used to establish water treatment standards.

which may be diverted to upstream reservoirs and provides that the "rate at which water is released from reservoirs for exchange shall be subject to control by the division engineer." The decree also provides that Pueblo "shall not exchange water upstream so as to prevent any intervening water right senior to the priority of the exchange being made from diverting the amount of water to which it would have legally been entitled in the absence of this exchange. . . ." [4]

The amount of water to be exchanged is determined, subject to the approval of the division engineer, through the use of involved accounting procedures.[5] The water court found that:

> [T]he evidence has shown that this form and method of accounting is adequate to provide the information to the Division Engineer necessary to protect the rights of other water users. . . . If any need for modification does develop, the Division Engineer shall require such change as a condition of allowing the exchange.

Finally, the water court held that "[i]t has been established with reasonable certainty that Pueblo can and will execute the proposed exchanges and apply the water so controlled to beneficial use, reuse and successive uses to extinction without causing injury to other water users." Accordingly, it granted Pueblo an absolute decree for 3.46 c.f.s. for existing exchanges and conditionally decreed additional proposed exchanges for 76.54 c.f.s.[6]

The cities moved for amendment of judgment and decree, asserting that because the decree dealt with a change of water right or a plan for augmentation, the water court must retain jurisdiction pursuant to section 37–92–304(6), 15 C.R.S. (1989). The water court denied this motion, finding that "§ 37–92–304(6), 15 C.R.S. (1989) is not applicable to this case because this case does not involve a plan for augmentation or change of water right."

The water court's conclusion, regarding the applicability of the retained jurisdiction provisions contained in section 37–92–304(6), 15 C.R.S. (1989), is the only aspect of its judgment and decree which has been appealed. The water court's findings of fact, which are supported by competent evidence and not challenged in this appeal, are binding on this court. *See, e.g., Orr v. City & County of Denver*, 194 Colo. 125, 572 P.2d 805 (1977). Therefore, our consideration of this appeal involves the application of the Colorado statutory scheme to the water court's findings of fact.

## II

### A

The cities argue that section 37–92–304(6), 15 C.R.S. (1989), is applicable to this case because Pueblo's exchange program involves a plan for augmentation. Section 37–92–304(6) provides that:

> Any decision of the water judge as specified in subsection (5) of this section dealing with a change of water right or a plan for augmentation shall include the condition that the approval of such change or plan shall be subject to recon-

---

4. The water court found that "Pueblo's rights of exchange and substitution are appropriative water rights . . . and like other appropriative water rights will be exercised within the priority system, so that Pueblo's rights of exchange and substitution are subject to the legitimate call of water rights senior to the priority of Pueblo's rights of exchange and substitution, and are able to call out water rights junior to the priority of Pueblo's rights of exchange and substitution all as decreed herein."

5. The accounting procedures consider among other things: the ratio of native to transmountain water in the system; the infiltration of groundwater into the Pueblo system; and certain transit and stream losses.

6. The decree provides that "Pueblo's exchanges of water may be accomplished in several ways. An actual upstream flow may be diverted while return flows are discharged or return flows already reduced to storage in another reservoir are released (a "River Flow Exchange"). Or, a volume of water already in storage in an upstream reservoir, which would otherwise be conveyed downstream, may be exchanged, with the consent of the owners of that stored water, for Pueblo's return flow then being discharged or already reduced to storage in another reservoir (a "Contract Exchange")."

sideration by the water judge on the question of injury to the vested rights of others for such period after the entry of such decision as is necessary or desirable to preclude or remedy any such injury.

The cities contend that Pueblo's plan comes within both the intent and the express definitional provisions of a plan for augmentation. They note that Pueblo is currently exchanging only 5% of the water covered by the decree and will probably not fully implement its plan until the year 2030. The cities argue the river will be injured, in ways which are currently unknown, when the exchange is fully implemented. They conclude that section 37–92–304(6) requires that jurisdiction be retained when plans for augmentation are involved in order to prevent injury.

Pueblo concedes that some water exchange projects are part of a plan for augmentation. It contends, however, that the exchange involved here does not involve a plan for augmentation. We agree.

A plan for augmentation is defined as: [A] detailed program to increase the supply of water available for beneficial use in a division or portion thereof by the development of new or alternate means or points of diversion, by a pooling of water resources, by water exchange projects, by providing substitute supplies of water, by the development of new sources of water, or by any other appropriate means....

§ 37–92–103(9), 15 C.R.S. (1989).

In interpreting a statute, whenever possible, each word should be given effect and each provision construed in harmony with the overall statutory scheme. In section 37–92–302(1)(a), 15 C.R.S. (1989), the legislature enumerated the various matters which may be heard by the water court under the resume-notice statute, providing that:

Any person who desires a determination of a water right or a conditional water right and the amount and priority thereof, including a determination that a conditional water right has become a water right by reason of the completion of the appropriation, a determination with re-spect to a change of a water right, *approval of a plan for augmentation,* quadrennial finding of reasonable diligence, *approval of a proposed or existing exchange of water* under section 37–80–120 or 37–83–104, or approval to use water outside the state pursuant to section 37–81–101 shall file with the water clerk in quadruplicate a verified application setting forth facts supporting the ruling sought, a copy of which shall be sent by the water clerk to the state engineer and the division engineer....

(Emphasis added.)

We note that the "approval of a proposed or existing exchange of water under section 37–80–120 or 37–83–104" is listed separately from the approval of a plan for augmentation. If an exchange of water were interpreted as not being a distinct claim, then the separate listing of this claim would be superfluous and redundant.

Similarly, the legislature created an exception to the general priority rules applicable to existing exchanges. Section 37–92–305(10), 15 C.R.S. (1989), provides that:

If an application filed under section 37–92–302 for approval of an existing exchange of water is approved, the original priority date or priority dates of the exchange shall be recognized and preserved unless such recognition or preservation would be contrary to the manner in which such exchange has been administered.

Further, the legislative history of sections 37–92–302(1)(a), 37–92–305(10) and 37–92–304(6), 15 C.R.S. (1989), indicates that the General Assembly distinguished proposed and existing exchanges from plans for augmentation. In 1981, the legislature amended section 37–92–302(1)(a) to add "approval of a proposed or existing exchange of water under section 37–80–120 or 37–83–104" to the enumerated claims which are subject to the jurisdiction of the water court. By the amendment, the General Assembly evidenced an intent to allow for the adjudication of an exchange of water independently from a plan for augmentation. If exchanges were not considered a

separate claim, the amendment would be meaningless.

Later that session, the General Assembly added section 37–92–305(10) and amended section 37–92–304(6). Section 37–92–305(10), applicable only to water exchanges, preserves the original date of priority for existing exchanges that are adjudicated, while section 37–92–304(6) requires that jurisdiction be retained in cases involving plans for augmentation or a change of water rights.[7] It is significant that the legislature did not include water exchanges within the mandatory retained jurisdiction provisions, but did address them specifically in sections 37–92–305(10) and 37–92–302(1)(a).

■ Accordingly, we conclude that a proposed or existing water exchange is an independent claim, not subject to the retained jurisdiction provision of section 37–92–304(6), unless it occurs as part of a plan for augmentation. Pueblo's exchange plan is not part of a plan for augmentation because it is not part of "a detailed program to increase the supply of water available for beneficial use in a division." § 37–92–103(9), 15 C.R.S. (1989).

The volume of foreign and native water reaching the headwaters of the Arkansas River has not been increased. In the past, the return flow attributable to Pueblo's foreign water sources was not recaptured. This return flow reentered the river and was subject to use downstream. It is conceded, however, that Pueblo, if it wished, could successfully recapture and reuse its foreign water supply to extinction. It could also recapture and transport foreign water from its treatment facilities to its upstream reservoirs for future use. Both of these approaches would in effect "increase" the water available for Pueblo's use by utilizing return flows which were previously returned to the river. It is undisputed, however, that such use of foreign water would be appropriate, pursuant to section 37–82–106, 15 C.R.S. (1989), and would not involve a plan for augmentation.

Similarly, Pueblo's exchange of native water for transmountain water that it recaptured at its water treatment facilities does not involve a plan for augmentation. Under the exchange, users downstream from the Pueblo Treatment Facilities will continue to receive the full amount of water to which they are entitled. In effect, Pueblo has increased its water supply by more efficiently controlling its foreign water supply. This is an appropriate use of foreign water and does not constitute a plan for augmentation.

### B

´ ■ The cities also contend that Pueblo's exchange should be considered a plan for augmentation to effectuate the legislative intent of injury prevention. They claim that the type and degree of injury to the river will not be apparent until Pueblo fully implements the exchange, which admittedly will not occur for a number of years.

Pueblo contends, however, that the decree adequately addresses the cities' concerns. It notes that the statutory scheme allows for the administrative control of the exchange by the division engineer, and concludes that through this framework the legislature has addressed any potential injury which could result from this type of exchange.

Here, the water court reviewed the testimony of expert witnesses regarding the effect the exchange could have on the cities, and imposed restrictions upon Pueblo's plan. For example, the exchange is subject to the approval of the division engineer, who is charged with monitoring both the volume and quality of stream flow. The decree also requires that "the exchange be operated in such a way as not to reduce the flow of the river at the [cities' treatment plant] below a flow rate of 190 c.f.s." The water court found that this restriction would insure that the cities' water treatment program would not be ad-

---

**7.** Formerly the retention of jurisdiction by the water court was discretionary in these situa-   tions.

versely affected.[8] Finally, the water court specifically found that "it has been established with reasonable certainty that Pueblo can and will execute the proposed exchanges and apply the water so controlled to beneficial use, reuse and successive uses to extinction without causing injury to other water users." These findings are supported by competent evidence, are not challenged upon appeal, and are therefore binding upon this court. *Cf. Trans–County Water, Inc. v. Central Colorado Water Conservancy Dist.*, 727 P.2d 60 (1986).

Although the legislature could have provided for retained jurisdiction for plans of exchange, our interpretation of the applicable statutory provisions leads us to conclude that it did not. We hold that the water court's decree, which protects the cities' interests through administrative means, is consistent with both the statutory scheme and the underlying policy of injury prevention.

### III

■ The cities also contend that jurisdiction should be retained because Pueblo's exchange constitutes a change of water right. A change of water right is defined as:

[A] change in the type, place, or time of use, a change in the point of diversion, a change from a fixed point of diversion to alternate or supplemental points of diversion, a change from alternate or supplemental points of diversion to a fixed point of diversion, a change in the means of diversion, a change in the place of storage, a change from direct application to storage and subsequent application, a change from storage and subsequent application to direct application, a change from a fixed place of storage to alternate places of storage, a change from alternate places of storage to a fixed place of storage or any combination of such changes. The term "change of water right" includes changes of conditional

water rights as well as changes of water rights.

§ 37–92–103(5), 15 C.R.S. (1973).

At the conclusion of Pueblo's case-in-chief, the cities moved to dismiss Pueblo's application because certain foreign water rights were originally decreed as being for irrigational purposes and had not been changed to municipal use. The water court denied this motion, holding that:

Transmountain waters have unique properties, most importantly, the right to use, reuse, and successively use to extinction, free from the call of the river, unless those reuse rights are somehow abandoned or otherwise surrendered. The evidence showed that such a loss has not in fact occurred. The court is persuaded that the law of Colorado favors and encourages reuse of transmountain water.... There is also a general policy of our law which favors the maximum use of the water resources. Finally, the exchange statute itself, C.R.S. 37–80–120(4) urges recognition of exchanges "to the fullest extent possible...." This body of law favors particularly the right of the owner to make reuse of transmountain return flows.

(Citations omitted.)

The cities did not appeal this aspect of the court's holding and concede that "they have no objection to this portion of the decree as such."[9] However, they contend that Pueblo's "de facto" change of water right should be considered for purposes of retaining jurisdiction pursuant to section 37–92–304(6), 15 C.R.S. (1989). The cities contend that this de facto change includes changes in the " 'type of use' from irrigation to all uses, changes 'place' from land contemplated in the decrees to any location and the 'time' is no longer related to irrigation needs."

Well established principles regarding the treatment of foreign water provide the basis for our consideration of this issue. Foreign water has traditionally been treated differently from native water flows. For

---

8. Because this restriction has not been appealed, we express no opinion as to its merits.

9. Because the cities do not appeal this holding, we will not consider the merits of the water court's conclusion.

example, section 37–82–106(1), 15 C.R.S. (1989), provides that:

Whenever an appropriator has lawfully introduced foreign water into a stream system from an unconnected stream system, such appropriator may make a succession of uses of such water by exchange or otherwise to the extent that its volume can be distinguished from the volume of the streams into which it is introduced. Nothing in this section shall be construed to impair or diminish any water right which has become vested.

This provision is intended to promote flexible and efficient use of foreign water. Similarly, in *Denver v. Fulton Irrigating Ditch Co.*, 179 Colo. 47, 506 P.2d 144 (1972), we stated that the importer is entitled to reuse such water and to subsequently dispose of it. We noted that "in order to minimize the amount of water removed from Western Colorado, eastern slope importers should, to the maximum extent feasible, reuse and make successive uses of the foreign water." *Id.* at 54, 506 P.2d at 148. *See also Water Supply & Storage Co. v. Curtis*, 733 P.2d 680 (Colo.1989).

Both the legislative scheme and our prior decisions recognize that absent the appropriator's efforts, this water would not be in the basin to begin with. Accordingly, importers of foreign water are accorded wide latitude as to the use and disposal of the appropriated water.

For example, the appropriator of such waters may reduce or eliminate the amount of foreign water available to junior appropriators, by changing the time, place or manner in which these waters are used, even if junior appropriators are adversely affected. *See, e.g.*, 2 G. Vranesh, *Colorado Water Law* § 6.4 (1987). Because these actions involve foreign water and are addressed by section 37–82–106, 15 C.R.S. (1989), the general change of water right criteria, defined in section 37–92–103(5), 15 C.R.S. (1973), and the retained jurisdiction provision of section 37–92–304(6), 15 C.R.S. (1989), are inapplicable.

Similarly, section 37–82–106, 15 C.R.S. (1989), specifically authorizes the exchange of foreign water. Here, Pueblo seeks to exercise its statutory right of exchange. Its exchange program is not unusual, and is similar to the plan of exchange we considered in *Denver v. Fulton Irrigating Ditch Co.*, 179 Colo. 47, 506 P.2d 144 (1972). Pueblo's plan is also consistent with the goal of promoting flexible and efficient use of foreign water rights.

Finally, the water court's decree recognizes the special status of foreign water rights, while also addressing the cities' concerns. The water court correctly interpreted section 37–82–106, 15 C.R.S. (1989), in reaching its conclusion that Pueblo's plan of exchange did not fall within the definition of a change of water right contained in section 37–92–103(5), 15 C.R.S. (1973). The decree also protects the cities' interests by requiring that certain stream flows be maintained and making the exchange subject to the administration of the division engineer. The decree also provides that the water court has exclusive jurisdiction to review the determinations made by the division engineer in administering the exchange. *See also* § 37–92–503, 15 C.R.S. (1973).

The water court's decision adequately addresses the cities' concerns in a manner consistent with the overall statutory scheme. Accordingly, the judgment of the water court is affirmed.

ERICKSON, J., specially concurs.

Justice ERICKSON specially concurring:

I concur with the majority's conclusion that water exchanges are separate from and not necessarily included within the legislative definition of plan for augmentation and that the water court correctly held that it was not required by statute to retain jurisdiction over the decree approving Pueblo's water exchange project. However, I do not agree with the analysis employed by the majority in reaching the conclusion that the decree adequately addresses the objectors' concerns of unforeseen future injury.

Pueblo owns extensive Western Slope water rights pursuant to which it diverts

Colorado River Basin water to the Arkansas River. Although Pueblo may use the foreign water to extinction, much of the foreign water is released into the Arkansas River as treated effluent after being used as part of Pueblo's municipal water supply. To increase the efficiency of its water system, Pueblo developed plans to exchange the foreign water for native Arkansas River water. Pursuant to the exchange plan, Pueblo would provide return flows attributable to the foreign water, after release from its sewage treatment plants and the Comanche power plant, to downstream senior water rights as a substitute supply. Pueblo would then divert or store up to 80 c.f.s. of native water that formerly would have been used to fulfill downstream water rights.

Prior to its application for approval of the exchange project, Pueblo implemented a small portion of the proposed exchange project amounting to an exchange of 3.46 c.f.s. of water. The water court found that many of the effects of full implementation of the plan were unknown at the time the decree was entered. The decree authorizes the division engineer to administer the exchange project so as to avoid injury to senior water rights and to maintain a minimum stream flow of 190 c.f.s. in the Arkansas river at the outfall of the Fremont sewage treatment plant.[1] In addition, since only 3.46 c.f.s. of water is currently being exchanged, that portion of the decree approving the proposed exchange of the remainder of the 80 c.f.s. is conditional and Pueblo must make diligence showings until the exchange project is fully implemented.

The doctrine of prior appropriation does not operate in a fixed and immutable manner. To increase the efficiency of water use in this state, the General Assembly has established several statutory mechanisms that provide for flexibility in the use of water and promote maximum utilization of the resource. *See generally* H. Dunning, *The "Physical Solution" in Western Water Law,* 57 U.Colo.L.Rev. 445 (1986). Section 37-80-120 creates a statutory right to exchange water. Section 37-80-120(2), (4). An exchange made pursuant to section 37-80-120 may be adjudicated as an appropriative right. Section 37-80-120(4). A more limited form of exchange is established by section 37-83-104 in which a reservoir owner may supply downstream appropriators with water from its reservoir. The reservoir owner may then divert an equal amount, less evaporation and transit losses, upstream from the reservoir. Section 37-83-104.

A plan for augmentation is

a detailed program to increase the supply of water available for beneficial use in a division or portion thereof by the development of new or alternate means or points of diversion, by a pooling of water resources, by water exchange projects, by providing substitute supplies of water, by the development of new sources of water, or by other appropriate means.

Section 37-92-103(9), 15 C.R.S. (1989 Supp.). A change of water right is defined as

a change in the type, place, or time of use, a change in the point of diversion, a change from a fixed point of diversion to alternate or supplemental points of diversion, a change from alternate or supplemental points of diversion to a fixed point of diversion, a change in the means of diversion, a change in the place of storage, a change from direct application to storage and subsequent application, a change from storage and subsequent application to direct application, a change from a fixed place of storage to alternate places of storage, a change from alternate place of storage to a fixed place of storage, or any combination of such changes.

Section 37-92-103(5), 15 C.R.S. (1973).

A plan for augmentation by definition may include a water exchange project. Section 37-92-103(9); *see also* § 37-92-305(3), (5), 15 C.R.S. (1973 & 1989

---

**1.** Pursuant to a stipulation with the appellants, Pueblo has not appealed the decree's requirement of a minimum stream flow.

Supp.).[2] In addition, an exchange project may include changes of water rights as defined by the General Assembly in section 37–92–103(5). However, the statutory framework established by the General Assembly for the initiation, administration and adjudication of water exchanges clearly shows that the General Assembly recognized that an exchange of water can be separate and distinct from a plan for augmentation or a change of water right.

Although an exchange program may be adjudicated, water can be exchanged through a water exchange project administered by the state engineer without judicial approval. *See* § 37–80–120(1). On the other hand, both plans for augmentation and changes of water rights must be approved by the water court. Section 37–92–302(1)(a), 15 C.R.S. (1989 Supp.); *Fort Lyon Canal Co. v. Catlin Canal Co.*, 642 P.2d 501, 506 (Colo.1982) (changes of water rights cannot be effected without judicial approval).

Section 37–92–302(1)(a) separately provides for judicial approval of water exchanges apart from plans for augmentation and changes of water rights. A decreed exchange is given a priority date and is operated within the prior appropriation system. Section 37–92–305(10), 15 C.R.S. (1989 Supp.). A plan for augmentation allows the operator of the plan to take water outside of the prior appropriation system, section 37–92–305(5), (8), and therefore a plan for augmentation does not require a priority date. A change of water right retains the priority date of the original decree subject to terms and conditions for the prevention of injury to vested water rights. Section 37–92–305(3), (5).

Given the separate treatment by the General Assembly of plans for augmentation,

changes of water right and exchanges of water in section 37–92–302(1)(a) and the state engineer's statutory authority to administer water exchanges without judicial approval, I conclude that the General Assembly did not intend to require the water court to retain jurisdiction over a decree approving a water exchange made pursuant to sections 37–80–120 and –83–104. Section 37–92–304(6) requires the water court to retain jurisdiction to reconsider injury to vested rights only in decrees approving plans for augmentation or changes of water right and does not provide for mandatory retained jurisdiction in decrees approving water exchanges pursuant to section 37–8–120 or section 37–83–104.

The conclusion that the water court is not required to retain jurisdiction over an exchange of water leads to the issue of whether Pueblo's "water exchange project" can be considered a water exchange pursuant to sections 37–80–120 and –83–104 or a plan for augmentation. In operating its municipal water supply, Pueblo imports water from the Colorado River Basin to the Arkansas River thereby increasing the amount of water in the Arkansas River. According to section 37–83–101, 15 C.R.S. (1973), Pueblo may then take out of the Arkansas River the same amount of water minus evaporation and transit losses. Pueblo may use, reuse or otherwise dispose of the foreign water to extinction. Section 37–82–106, 15 C.R.S. (1989 Supp.); *City & County of Denver v. Fulton Irrigating Ditch Co.*, 179 Colo. 47, 52, 506 P.2d 144, 147 (1972). In this case, Pueblo has chosen to use return flows from its municipal sewage treatment plants and the Comanche power plant as a substitute supply for downstream senior appropriators in exchange for Pueblo's upstream diversion of

---

**2.** Section 37–92–305(3), 15 C.R.S. (1989 Supp.) provides in part that "A change of water right or plan for augmentation, including water exchange project, shall be approved if such change will not injuriously affect the owner of or persons entitled to use water under a vested water right or a decreed conditional water right."

Section 37–92–305(5), 15 C.R.S. (1973) provides:

In the case of plans for augmentation including exchange, the supplier may take an

equivalent amount of water at his point of diversion or storage if such water is available without impairing the rights of others. Any substituted water shall be of a quantity and quality so as to meet the requirements for which the water of the senior appropriator has normally been used, and such substituted water shall be accepted by the senior appropriator in substitution for water derived by the exercise of his decreed rights.

native water that would otherwise be used to fulfill the decreed water requirements of the downstream seniors.

I agree with the majority's conclusion that Pueblo's exchange project is not a plan for augmentation. Pueblo's transbasin diversions in the exercise of its decreed Colorado River Basin water rights predate Pueblo's exchange project and the exercise of those rights does not depend on judicial approval of the exchange. The water exchange project does not increase the beneficial use of water in Water Division No. 2 since the foreign water remains in the Arkansas River to be used by downstream appropriators in the absence of exchange or other use by Pueblo. The exchange project allows Pueblo to increase the efficiency of its transbasin diversions and does not create any net increase in water usage in the Arkansas River Basin.

Pueblo has partially implemented a complicated scheme of water withdrawal and replacement that will have significant effects on the Arkansas River. Full implementation of Pueblo's program is not expected for a number of decades. The retained jurisdiction provision of section 37–92–304(6) is a recognition by the General Assembly that predictions of future injury caused by plans for augmentation and changes of water rights involve an inherent amount of uncertainty. The retained jurisdiction provision allows the water court and water users to achieve flexibility in implementing programs to increase the beneficial use of water and at the same time ensures protection of vested water rights. The same considerations are applicable to water exchange projects.

I disagree with the majority's implication that the division engineer's authority to administratively control Pueblo's exchange project and the water court's continued jurisdiction on the issue of diligence is an appropriate substitute for retained jurisdiction on the issue of injury pursuant to section 37–92–304(6). The division engineer is constrained by the provisions of the decree while the objectors, pursuant to section 37–92–304(6), would be able to reopen the decree for reconsideration of the issue

of injury to vested water rights. Moreover, with respect to the conditional nature of the decree, the only issue at a future diligence hearing will be whether Pueblo has proceeded with diligence in putting the exchanged water to beneficial use. However, the General Assembly has expressly mandated retained jurisdiction only in cases involving plans for augmentation and changes of water rights.

Since our interpretation of section 37–92–304(6) must give effect to the intent of the General Assembly, I conclude that the water court correctly held that it was not required to impose a retained jurisdiction provision to the decree approving Pueblo's water exchange project. Accordingly, I concur in the result reached by the majority.