CHIEF JUSTICE RICE,
dissenting in part and concurring in part.
¶74 The majority concludes that the water court erred when it: (1) concluded that stor *471 age of the Busk-Ivanhoe rights on the eastern slope prior to use was lawful; (2) included the volumes of exported water paid as rental fees for storage on the eastern slope in its historic consumptive use quantification of the water rights; and (3) concluded that it was required to exclude the twenty-two years of undecreed use of the subject water rights from the representative study period. Maj. op. ¶¶ 7-9. In my view, however, the storage on the eastern slope prior to use'was lawful because it was within the scope of the appropriation and the storage did not expand the original water right. Because I would conclude that the storage of the Busk-Ivanhoe rights on the eastern slope was lawful, paying for this storage in volumes of water was therefore also lawful such that the volumes of water paid for storage were properly included in the quantification analysis. However, I agree with the majority that the water court erred in concluding that it was required to exclude the periods of undecreed use from the representative study period. Accordingly, I respectfully dissent in part and concur in part.
I. Storage of the Water Rights in the Arkansas River Basin Was Lawful
¶75 While I agree with the majority’s general conclusion that transmountain water rights by their nature do not necessarily include a storage right or automatically justify inclusion of stored water in a historic consumptive use quantification, I disagree with the majority’s ultimate conclusion that storage of the Busk-Ivanhoe rights on the eastern slope prior to use was unlawful. See maj. op. ¶¶ 46, 61. Instead, I would conclude that eastern slope storage was lawful for the purposes of the change application in this specific instance because storage was within the scope of the original appropriation and did not expand the original water right. As such, the water court properly included the stored water in its quantification of the historic consumptive use of the Busk-Ivanhoe rights.
A. Eastern Slope Storage was Within the Scope of the Appropriation
¶76 The scope of a water right is defined by the intent of the appropriator at the time of appropriation. V Bar Ranch LLC v. Cotten, 233 P.3d 1200, 1208 (Colo. 2010). To determine the scope of the Busk-Ivanhoe right, the water court took evidence regarding the intent of the Carltons, the original appropriators, and determined the weight to give that evidence in analyzing the circumstances surrounding entry of the 2621 Decree. It found as a matter of fact, based on evidence, including statements and filings made prior to the Decree, that the Carltons always contemplated storage of the Busk-Ivanhoe water rights as a part of the appropriation. Accordingly, the water court held that the intent to store on the eastern slope prior to use was part of the original appropriation and that such intent was understood by the court and reflected in its decree.
¶77 Specifically, the water court found that approximately three years prior to the filing of the Carlton’s-petition in Case, 2621, L.G. Carlton filed a Map and Statement for Lake Fork Reservoir on the eastern slope. Although the reservoir was never constructed, it was intended to be on Lake Fork Creek, a short distance upstream from Sugarloaf Reservoir, where the water was eventually stored instead, The ¡water court found that this filing reflected the Carltons’ intent to store the water derived from the Busk-Ivanhoe System in the Arkansas River Basin, and that this intent was instead later effectuated through the storage of the water in the Sugarloaf Reservoir, among others. The water court also noted that, prior to the 2621 Decree, an agent of the Carltons attended a meeting during which he offered to sell a one-half interest in the Busk-Ivanhoe System to the High Line Canal Company. According to the meeting minutes, the agent represented that the water in the Busk-Ivanhoe System was brought through the Ivanhoe Tunnel and stored in Sugarloaf Reservoir and Clear Creek Reservoir. Based on this and other contracts from that time referring to the water rights as “storage water,” the water court found that, at least as early as 1926, the Busk-Ivanhoe water was marketed to potential buyers as “resérvoir water.”
¶78 The water court further found that storage of the Busk-Ivanhoe water in the *472 Arkansas Basin on the eastern slope, was necessary for the effective and beneficial use of the Busk-Ivanhoe water rights as decreed in the 2621 Decree. Undisputed evidence before the water court established that in the Arkansas River Basin, water rights junior to 1887 were highly unreliable. Thus, except for very senior rights, the natural flows of the Arkansas River were inadequate to meet crop demands early in the irrigation season and from mid-summer through the end of the irrigation season. Therefore, the water court determined that without additional storage in the Arkansas Basin, most of the water produced by the Busk-Ivanhoe System would not be available at the time needed to provide a supplemental irrigation supply.
¶79 Given this, I would conclude that under the facts of this ease, storage was necessary to effectuate the lawfully decreed irrigation rights. As such, the fact that Busk-Ivanhoe- did not have a separate decree for storage of water on the eastern slope is immaterial to the question of whether the storage was within the scope of the decree— and by extension to whether the storage was lawful. The water at issue had been lawfully appropriated under the 2621 Decree. Once the water crossed through the Ivanhoe Tunnel onto the eastern slope and into the Arkansas Basin, it was lawfully appropriated water that existed independent of the priority system. See City of Thornton v. Bijou Irrigation Co., 926 P.2d 1, 66 n.59 (Colo. 1996). No water user in the basin of import could make any claim to it while the water was in the basin, see Pub. Sery. Co. of Colo. v. Willows Water Dist., 856 P.2d 829, 833 (Colo. 1993), because none of these users had any rights to the transmountain water, see City of Florence v. Bd. of Waterworks, 793 P.2d 148, 153 (Colo. 1990). Instead, the importers were entitled to the “fruits of their labors,” Bijou Irrigation, 926 P.2d at 66 n.59, accorded wide latitude as to the use and disposal of the appropriated water, and could change “the. time, place or manner in which these waters [were] used, even if junior appropriators [were] adversely affected,” City of Florence, 793 P.2d at 154. As such, Busk-Ivanhoe could store the water without a separately decreed priority because the water existed apart from the priority system of the eastern slope and storage only affects the “time, place, or manner” of use. Id. It follows, then, that a further decreed right to store water in the Arkansas Basin was not necessarily needed in this case.
¶80 Additionally, that storage was not expressly decreed in the 2621 Decree does not undermine my conclusion that storage on the eastern slope was within the scope of the appropriation. As the water court correctly concluded, the scope of a water court’s authority under Colorado statutes as they existed in the 1920s explains this omission. This decree was issued under the 1921 Act. It is undisputed that the 1921 Adjudication Laws limited a district court’s authority to adjudicate water rights to a single water district: “any one or more persons, associations or corporations, interested as owners of any ditch, canal or reservoir in any water district shall present to the district court of any county having jurisdiction of priority of rights to the use of water for irrigation in such water district_” 1921 Compiled Laws of Colorado § 1760, C.L. (1921) (emphasis added). The Busk-Ivanhoe water rights were adjudicated in 1928 in the Garfield County District Court, which was within Water District 38. Under the 1921 Act, the Garfield County District Court did not havé authority in 1928 to adjudicate a priority for the storage of water on the eastern slope because any eastern slope reservoir was not a reservoir “in such district” as required under the 1921 Adjudication Laws. See id. This limit on the District Court’s authority explains why storage on the eastern slope, while part of the appropriators’ plan and intent in adjudicating transmountain diversion rights for supplemental irrigation, was not explicitly described in the Decree.
¶81 Moreover, because the decree was silent as to eastern slope storage, the water court here acted well within its broad authority in examining various documents to determine the intent of the Carltons in appropriating the Busk-Ivanhoe water for transmountain diversion and use and related storage on the eastern slope. When a water court is presented with a' decree that does not address the issue in question, the decree is silent. In re Water Rights of Cent. Colo. *473 Water Conservancy Dist. (“Jones Ditch”), 147 P.3d 9, 16 (Colo. 2006). A decree that is silent on a specific point permits the consideration of surrounding facts and circumstances to determine the intent of parties and the meaning of the decree. In re Tonko, 154 P.3d 397, 405 (Colo. 2007); see Cherokee Metro. Dist. v. Simpson, 148 P.3d 142, 146-47 (Colo. 2006). Determining the meaning of a decree includes ascertaining the scope of the water right. Jones Ditch, 147 P.3d at 16; V Bar Ranch, 233 P.3d at 1207. The scope of a water right is defined by the intent of the appropriator at the time of appropriation. V Bar Ranch, 233 P.3d at 1208. Therefore, when, as here, a decree is silent on the issue in question, it is appropriate for a water court to consider evidence about the intent of the appropriator at the time of the appropriation relative to the issue in question. See Jones Ditch, 147 P.3d at 16.
¶82 More broadly, water courts may “construe and make determinations regarding the scope of water rights adjudicated in prior decrees” because doing so is “consistent with the fundamental principle that adjudications of water rights have as their object the confirmation of pre-existing rights.” S. Ute Indian Tribe v. King Consol. Ditch Co. (“Southern Ute”), 250 P.3d 1226, 1234 (Colo. 2011). While a decree should be “complete and certain in itself,” a “decree is not woven of thin air.... It is grounded on the facts creating that issue.” Hinderlider v. Canon Heights Irrigation & Reservoir Co., 117 Colo. 183, 185 P.2d 325, 327-28 (1947). Additionally, a water court has the authority to determine a decree’s setting, intent, meaning, and effect when “ascertaining the existence of an undecreed enlargement of a decreed right.” Burlington Ditch Reservoir & Land Co. v. Metro Wastewater Reclamation Dist., 256 P.3d 645, 660 (Colo. 2011); see also Southern Ute, 250 P.3d at 1234. Relatedly, it also has the authority to “examine documents and take evidence about the facts and circumstances surrounding entry of a decree, in order to determine the decree’s setting, intent, meaning, and effect....” In re Tonko, 154 P.3d at 405.
¶83 Given this broad authority, I disagree with the majority that it was improper both for the water court to have considered extrinsic evidence apart from only the petition and statement of the claim in determining the Carltons’ intent and to have relied on evidence that was not before the Garfield Court in the 2621 proceedings. See maj. op. ¶ 43. Instead, I would conclude that because the scope of a water right is defined by the intent of the appropriator at the time of the appropriation, V Bar Ranch, 233 P.3d at 1208, the water court properly considered the evidence before it regarding the intent of the appropriators, which in this case meant the water court considered evidence of whether or not the Carltons intended that the Busk-Ivanhoe water was to be stored in the Arkansas Basin. Indeed, it makes little sense to limit the water court as the majority suggests when the relevant question is the scope of the water right. Moreover, because a decree that is silent on a specific point requires the “consideration of surrounding facts and circumstances to determine the intent of parties and the meaning of the decree,” In re Tonko, 154 P.3d at 405, it is necessary and appropriate for a water court to look beyond the decree and the statement of the claim to determine the intent of the appropriators.
¶84 Ultimately, “[w]e accept the water court’s factual findings on appeal unless they are so clearly erroneous as to find no support in the record.” Burlington Ditch, 256 P.3d at 660. Here, there was evidence in the record to properly find that the factual circumstances at the time of the 2621 Decree reflect the Carltons’ intent to store the water rights on the eastern slope before use for supplemental irrigation. As such, this court should accept the water court’s finding that there was an intent to store on the eastern slope. I would therefore hold that because the storage was intended by the appropriators and necessary to effectuate the lawfully decreed appropriation, storage was within the scope of the appropriation.
B. Eastern Slope Storage Did Not Expand the Decreed Water Right
¶85 Eastern slope storage did not expand the original water right because there was no injury to other water users. As the majority *474 explains, a change application continues in a new form the rights decreed in the original appropriation and may not expand the amount of water actually used under the original decree. ISG, LLC v. Ark. Valley Ditch Ass’n. 120 P.3d 724, 732 (Colo.), as modified on denial of reh’g (Oct. 11, 2005). The statutory standard for approval of a change of water rights is: “A change of water right ... shall be approved if such change ... will not injuriously affect the owner of or persons entitled to use water under a vested water right or a decreed conditional water right....” § 37-92-305(3)(a), C.R.S. (2016). When an appropriator diverts water within the decreed amount and removes it from the native basin, the use of the water in the basin of import has no effect on the basin of origin. See State Dep’t of Nat. Res., Div. of Wildlife v. Ogburn, 194 Colo. 60, 570 P.2d 4, 5 (1977) (noting that once transmountain water is exported, the basin of origin is no longer affected by the use to which imported water is put). As we observed in Ogbum, once water flows into the transmountain tunnel, one-hundred percent consumption occurs as far as the “losing” river basin is concerned, and no further injury can accrue to native appropriators (i.e., appropriators in the basin of export). Id. at 6 (Erickson, J., dissenting). And appropriators of water rights in the “gaining” division cannot establish rights against the importer because they have no claims to the imported water. Id Therefore, after export from the basin of origin, “no injury can result to appropriators in either, division.” Id.; see also City of Florence, 793 P.2d at 154 (“[T]he appropriator of [trans-mountain water] may reduce or eliminate the amount of foreign water available to junior appropriators, by changing the time, place or manner in which these waters are used, even if junior appropriators are adversely affected”).
¶86 The original intent of the' appropriators to store water was a factual issue reviewed by the water court in this case. After carefully examining the evidence,, the water court ultimately concluded that, although the decree did not contain a specific volumetric limit, the originally contemplated amounts of Busk-Ivanhoe water- included amounts diverted for storage on the eastern slope. Thus, Busk-Ivanhoe’s proposed change neither expands the use of the water right nor injures western slope users. Going forward, so long as Busk-Ivanhoe does not exceed its decreed average volumetric limit,[1] there is no need for a storage decree at any eastern slope reservom. If the volumetric limit is not exceeded, and the water rights are exercised in priority, no injury can occur. See Twin Lakes Reservoir & Canal Co. v. City of Aspen, 193 Colo. 478, 568 P.2d 45, 50 (1977) (“To us, a very important factor in this proceeding is the stipulated and decreed volumetric limitation operating annually and on a ten-year running average.”).
¶87 In sum, because an undecreed storage right was within the scope of the appropriation based on the evidence in the record regarding the intent of the original appropriation and because storage was not an expansion of the right, I would conclude that storage of the subject water rights in the basin of import was a component of the Busk-Ivanhoe System appropriation and was therefore lawful. Thus, I would find that the water court properly included the stored water in' its quantification of the historic beneficial use of the Busk-Ivanhoe rights.
II. Payment in Volumes of Water for Storage in the Arkansas Basin
¶88 As discussed above, I would hold that the storage of the Busk-Ivanhoe rights in the Arkansas River Basin was implied in the 2621 Decree. I would therefore hold- that paying for this storage in volumes of water was lawful because it was part of a reasonably efficient practice to accomplish the decreed storage and subsequent use of the water rights. It is well-settled that “the right to change a water right is limited to that amount of water actually used beneficially pursuant to the decree at the appropriator’s place of use,” Santa Fe Trail Ranches Prop. Owners Ass’n v. Simpson, 990 P.2d 46, 54 (Colo, 1999). “Beneficial use” is defined as “the use of that amount of water that is *475 reasonable and appropriate under reasonably efficient practices to accomplish without waste the purpose for which the appropriation is lawfully made.” § 37-92-103(4), C.R.S. (2016) (emphasis added). Busk-Ivanhoe’s expert testified that storage was needed to beneficially use the Busk-Ivanhoe water and that the Carltons needed to pay the fees at issue in order to store the water. The expert considered the volumes of water paid for storage as “the costs of doing business, of developing a water supply that comes out of the reservoir.” The water court found that this testimony was supported by the record and by the factual circumstances. Thus, I would conclude that the volumes of water paid for storage were part of the lawful beneficial use of the decreed water rights and were properly included in the quantification analysis.
III. Conclusion
¶89 In sum, I would hold that, based on evidence in the record regarding the intent and scope of the original appropriation, storage of the subject water rights in the basin of import was a component of the Busk-Ivanhoe System appropriation and was therefore lawful. Accordingly, the water court properly included the stored water in its historic consumptive use quantification of the Busk-Ivanhoe rights. In addition, because storage of the subject water rights in the basin of import was lawful, and because payment for storage in volumes of water was a reasonable and efficient practice to accomplish the lawful use of the subject water rights under the facts of this case, the water court properly included the volumes of water paid for storage in reservoirs in the basin of import in its historic consumptive use quantification. Finally, the water court erred in excluding the years of undeereed use, of the subject water rights from the representative study period and instead should have considered including any years of unjustified nonuse of the decreed water rights as zero-use years. Accordingly, I would affirm in part and reverse in part the water court’s May 27, 2014 order and August 16, 2014 judgment, and decree and remand to Water Division 2 for further proceedings consistent with this opinion,
I am authorized to state that JUSTICE HOOD joins in this dissent in part and concurrence in part.

. The water court decreed that the average volumetric limit is 2,416 acre-feet per year. This limit will likely change on remand per the majority's holding.