Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us.  Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
December 5, 2016

2016 CO 75

**No. 14SA303, <u>Grand Valley Water Users Ass'n v. Busk-Ivanhoe, Inc.</u>—Change of Water Right Application—Historic Consumptive Use Analysis—Transmountain Diversion.**

This appeal from the water court in Water Division 2 concerns certain rulings relevant to the historic consumptive use quantification of transmountain water rights that are the subject of a change application.  The supreme court holds that the water court erred when it concluded that storage of the water rights on the eastern slope prior to use for their decreed purpose was lawful.  The supreme court concludes that the right to store water in the basin of import prior to use is not an automatic incident of transmountain water rights, but rather, must be reflected, or at least implied, in the decree.  In this case, the decree is silent with respect to storage of the water on the eastern slope prior to use for supplemental irrigation and, on the facts of this case, the record does not support the water court's finding of an implied right in the decree for such storage. To the extent that unlawful storage of the water on the eastern slope expanded the decreed rights, such amounts cannot be included in the quantification of those rights.

Because storage of the subject water rights in the basin of import prior to use was unlawful, the water court erred in including the volumes of exported water paid as rental fees for storage on the eastern slope in its historic consumptive use quantification of the water rights.

Finally, the water court erred in concluding that it was required to exclude the twenty-two years of undecreed municipal use of the subject water rights from the representative study period. In this case, the undecreed use did not represent expanded use of the decreed right for which an appropriator may not receive credit but rather, twenty-two years of non-use of the decreed rights. Because unjustified non-use of a decreed right should be considered when quantifying historic consumptive use for purposes of a change application, the water court must determine whether the years of non-use of the rights for their decreed purpose were unjustified. If so, the water court should consider including the years of unjustified non-use in the representative study period as "zero-use" years for purposes of its historic consumptive use analysis. Accordingly, the supreme court reverses the water court's rulings and remands for further proceedings consistent with this opinion.

**The Supreme Court of the State of Colorado**

2 East 14th Avenue • Denver, Colorado 80203

___

**2016 CO 75**

___

**Supreme Court Case No. 14SA303**

*Appeal from the District Court*

Pueblo County District Court, Water Division 2, Case Nos. 09CW142,

Water Division 1, 09CW272,

Water Division 5, 09CW186,

Honorable Larry C. Schwartz, Water Judge

___

Concerning the Application of Busk-Ivanhoe, Inc., a Colorado corporation in Adams, Arapahoe, Chaffee, Douglas, Jefferson, Lake, Pitkin, and Weld Counties, Colorado,

**Opposers–Appellants:**

Grand Valley Water Users Association; Orchard Mesa Irrigation District; Ute Water Conservancy District acting by and through the Ute Water Activity Enterprise; Colorado River Water Conservation District; Basalt Water Conservancy District; Board of County Commissioners of Eagle County; Board of County Commissioners of Pitkin County; Dick Wolfe, P.E., State Engineer; David L. Nettles, P.E., Division Engineer for Water Division 1; Steve Witte, P.E., Division Engineer for Water Division 2; and Alan Martellaro, P.E., Division Engineer for Water Division 5,

and

**Opposers–Appellees:**

High Line Canal Company; Southeastern Colorado Water Conservancy District; and The City and County of Denver, acting by and through its Board of Water Commissioners,

and

**Opposer–Appellant/Opposer–Appellee:**

Board of Water Works of Pueblo, Colorado,

and

**Opposer:**

Centennial Water and Sanitation District,

v.

**Applicant–Appellee:**

Busk-Ivanhoe, Inc., a Colorado corporation.

**Judgment Reversed**
*en banc*
December 5, 2016

**Attorneys for Opposers–Appellants Grand Valley Water Users Association, Orchard Mesa Irrigation District, and Ute Water Conservancy District acting by and through the Ute Water Activity Enterprise:**
Williams, Turner & Holmes, P.C.
Kirsten M. Kurath
Mark A. Hermundstad
  *Grand Junction, Colorado*

**Attorneys for Opposers–Appellants Colorado River Water Conservation District, Basalt Water Conservancy District, and Board of County Commissioners of Eagle County:**
Balcomb & Green, P.C.
David C. Hallford
Christopher L. Geiger
Scott Grosscup
  *Glenwood Springs, Colorado*

**Attorneys for Opposer–Appellant Board of County Commissioners of Pitkin County:**
Moses, Wittemyer, Harrison and Woodruff, P.C.
Timothy J. Beaton
Jennifer M. DiLalla
  *Boulder, Colorado*

**Attorneys for Opposers–Appellants Dick Wolfe, P.E., State Engineer, David L. Nettles, P.E., Division Engineer for Water Division 1, Steve Witte, P.E., Division Engineer for Water Division 2, and Alan Martellaro, P.E., Division Engineer for Water Division 5:**
Cynthia H. Coffman, Attorney General
Paul L. Benington, First Assistant Attorney General
  *Denver, Colorado*

**Attorneys for Opposer–Appellant/ Opposer–Appellee Board of Water Works of Pueblo, Colorado:**
Carlson, Hammond & Paddock, LLC
William A. Paddock
Mary Mead Hammond
Karl D. Ohlsen
  *Denver, Colorado*

**Attorneys for Opposer–Appellee Southeastern Colorado Water Conservancy District:**
Burns, Figa & Will, P.C.
Stephen H. Leonhardt
Sarah M. Shechter
  *Greenwood Village, Colorado*

**Attorneys for Opposer–Appellee City and County of Denver, acting by and through its Board of Water Commissioners:**
Patricia L. Wells, General Counsel
Casey S. Funk
Mary J. Brennan
Daniel J. Arnold
James M. Wittler
  *Denver, Colorado*

**Attorneys for Applicant–Appellee Busk-Ivanhoe, Inc.:**
Hamre, Rodriguez, Ostrander & Dingess, P.C.
John M. Dingess
Austin Hamre
  *Denver, Colorado*

**Attorneys for Amicus Curiae Cache La Poudre Water Users Association and for Amicus Curiae City of Northglenn:**
Fischer, Brown, Bartlett & Gunn, P.C.
William R. Fischer
Donald E. Frick
  *Fort Collins, Colorado*

**Attorneys for Amici Curiae City of Colorado Springs and Twin Lakes Reservoir and Canal Company:**
Michael Gustafson, City Attorney
  *Colorado Springs, Colorado*

Hill & Robbins, P.C.
David W. Robbins
  *Denver, Colorado*

Carlson, Hammond & Paddock, LLC
William A. Paddock
Mary Mead Hammond
Karl D. Ohlsen
  *Denver, Colorado*

**Attorneys for Amicus Curiae Board of County Commissioners for the County of Grand:**
White & Jankowski, LLP
David C. Taussig
Mitra M. Pemberton
  *Denver, Colorado*


**Attorneys for Amicus Curiae Lower Arkansas Valley Water Conservancy District:**
Berg Hill Greenleaf & Ruscitti LLP
Peter D. Nichols
Leah K. Martinsson
  *Boulder, Colorado*


Mendenhall & Malouff
H. Barton Mendenhall, II
  *Rocky Ford, Colorado*


**Attorneys for Amici Curiae Northern Colorado Water Conservancy District, Municipal Subdistrict, and the City of Greely, acting by and through its Water and Sewer Board:**
Trout, Raley, Montaño, Witwer & Freeman, P.C.
Bennett W. Raley
Douglas M. Sinor
Lisa M. Thompson
  *Denver, Colorado*


Greeley City Attorney's Office
Andrew B. Nicewicz
  *Greeley, Colorado*


Vranesh and Raisch, LLP
Paul J. Zilis
  *Boulder, Colorado*


Riley Carlock & Applewhite
Brian M. Nazarenus
Susan M. Ryan
  *Denver, Colorado*


City of Lafayette
David C. Lindholm
  *Lafayette, Colorado*

4

Starr & Westbrook, P.C.
Randolph W. Starr
Michael A. Westbrook
  *Loveland, Colorado*

Petrock & Fendel, P.C.
Frederick A. Fendel, III
  *Denver, Colorado*

**Attorneys for Amicus Curiae The Consolidated Mutual Water Company:**
Collins Crockrel & Cole, P.C.
Evan D. Ela
Joseph W. Norris
  *Denver, Colorado*

**JUSTICE MÁRQUEZ** delivered the Opinion of the Court.
**CHIEF JUSTICE RICE** dissents in part and concurs in part, and **JUSTICE HOOD** joins in the dissent in part and concurrence in part.

¶1 This appeal from the water court in Water Division 2 challenges certain rulings relevant to the historic consumptive use quantification of transmountain water rights that are the subject of a change application.

¶2 The City of Aurora, Colorado ("Aurora"), is the sole owner of the capital stock of Busk-Ivanhoe, Inc. ("Busk-Ivanhoe"). Busk-Ivanhoe owns a one-half interest in water rights decreed in 1928 to the Busk-Ivanhoe System for supplemental irrigation in the Arkansas River Basin by Garfield County District Court in Civil Action No. 2621 (the "2621 Decree"). The Busk-Ivanhoe System is a transmountain diversion from the Colorado River Basin on the western slope in Water Division 5, through the Ivanhoe Tunnel at the Continental Divide, to the Arkansas River Basin on the eastern slope in Water Division 2.

¶3 The 2621 Decree confirmed absolute and conditional appropriations to divert water from tributaries of the Roaring Fork River, and includes a priority for storage of 1,200 acre-feet of the diverted water in the Ivanhoe Reservoir on the western slope. Under the terms of the decree, the diverted water is exported through the Ivanhoe Tunnel to the eastern slope—some amounts on an immediate basis and some after storage in the Ivanhoe Reservoir (on the western slope). The decree, however, contains no reference at all to storage of the exported water on the eastern slope prior to its decreed use for supplemental irrigation in the Arkansas River Basin. Nevertheless, transmountain water decreed to the Busk-Ivanhoe System has been stored in reservoirs on the eastern slope before being put to beneficial use.

6

¶4    In 1987, at Aurora's direction, Busk-Ivanhoe began to put its water rights to municipal use in Aurora in Water Division 1.  However, Busk-Ivanhoe did not file an application to change the type and place of use of these rights until 2009.  That change application is the subject of this appeal.

¶5    In its May 27, 2014, Findings of Fact, Conclusions of Law, and Order ("May 2014 Order"), the water court for Water Division 2 approved Busk-Ivanhoe's change application to allow use of the subject water rights within Aurora's municipal system. It confirmed these rulings in its August 15, 2014, Judgment and Decree ("August 2014 Judgment and Decree") approving the change application.

¶6    The issues raised in this appeal concern the water court's quantification of the water rights to be changed under the application.  Relevant here, the water court concluded that: (1) storage of the water rights on the eastern slope prior to use was lawful despite the 2621 Decree's silence on the issue, and, therefore, the quantification of the historic consumptive use of those rights should include water used for its decreed purpose after release from storage on the eastern slope; (2) volumes of exported water paid to rent storage on the eastern slope should also be included in the historic consumptive use quantification of the water rights; and (3) the twenty-two-year period of undecreed use of the water rights for municipal purposes must be excluded from the representative study period when calculating the historic consumptive use of the decreed rights.  Opposers–Appellants—who include the State Engineer and Division Engineers for Water Divisions 1, 2, and 5 (collectively, the "Engineer Opposers"), as

well as several entities located in the Colorado River Basin (collectively, the "Western Slope Opposers")[1]—challenge the water court's conclusions.

¶7     As set forth more fully below, we hold as follows.  First, the water court erred when it concluded that storage of the Busk-Ivanhoe rights on the eastern slope prior to use was lawful.  On remand, the water court must requantify the water rights subject to change; to the extent that unlawful storage of the water on the eastern slope prior to use expanded the decreed rights, such amounts cannot be included in the historic use quantification of those rights.

¶8     Second, because storage of the subject water rights in the basin of import was unlawful, the water court erred in including the volumes of exported water paid as rental fees for storage on the eastern slope in its historic consumptive use quantification of the water rights.

¶9     Finally, the water court erred in concluding that it was required to exclude the twenty-two years of undecreed use of the subject water rights from the representative study period.  In this case, the period of undecreed use reflects twenty-two years of non-use of the decreed rights.  Because unjustified non-use of a decreed right should be considered when quantifying historic consumptive use for purposes of a change application, we remand the case to the water court to determine whether the years of

---

[1] These entities include the Colorado River Water Conservation District, the Eagle County Board of County Commissioners, the Basalt Water Conservancy District, the Pitkin County Board of County Commissioners, the Grand Valley Water Users Association, the Orchard Mesa Irrigation District, and the Ute Water Conservancy District.

non-use of the Busk-Ivanhoe rights for their decreed purpose were unjustified. If so, the water court should consider including the years of unjustified non-use in the representative study period as "zero-use" years for purposes of its historic consumptive use analysis. Accordingly, we reverse the water court's May 2014 Order and August 2014 Judgment and Decree and remand to Water Division 2 for further proceedings consistent with this opinion.

## I. Facts and Procedural History

¶10 The water rights at issue in this case are an undivided one-half interest in the Busk-Ivanhoe System water rights. The Busk-Ivanhoe System water rights were originally adjudicated to A.E. and L.G. Carlton in Water District 38 on January 9, 1928, by the Garfield County District Court in Case No. 2621, and were decreed for supplemental irrigation on 80,000 acres of land in the Arkansas River Basin. At the time of the appropriation, the Arkansas River Basin was over-appropriated and junior water rights did not provide sufficient water during the entire irrigation season. By contrast, the Colorado River Basin had water available for appropriation.

¶11 The Busk-Ivanhoe System is composed of three ditches (Lyle Ditch, Pan Ditch, and Hidden Lake Creek Ditch), the Ivanhoe Reservoir, and the Ivanhoe Tunnel. The ditches divert spring runoff from small tributaries to the Roaring Fork River in the Colorado River Basin. The ditches deliver this water to the Ivanhoe Reservoir, an on-channel reservoir that also captures the entire natural flow of Ivanhoe Creek. The 2621 Decree adjudicates absolute direct flow rights for waters from Ivanhoe Creek and Lyle Ditch, and conditional direct flow rights for waters from Pan Ditch and Hidden Lake

9

Creek Ditch.[2]   The 2621 Decree provides that these direct flow rights flow through the Ivanhoe Reservoir to the Ivanhoe Tunnel.  The 2621 Decree also adjudicates an absolute right for storage of 1,200 acre-feet of water from Ivanhoe Creek and the ditches in the Ivanhoe Reservoir on the western slope.  The Ivanhoe Tunnel carries both the direct flow water and the water released from storage in the Ivanhoe Reservoir "onto the Eastern Slope of said Continental Divide where the same is discharged at the east portal of said tunnel into Lake Fork Creek, a tributary of the Arkansas River, and later diverted from said streams and used in the irrigation of lands within the State of Colorado lying along said streams and susceptible of irrigation therefrom." 2621 Decree, ¶ 5.

¶12     The 2621 Decree makes no reference to storage of the water on the eastern slope prior to being put to its decreed use for supplemental irrigation.  Nevertheless, water diverted under the decree has been stored on the eastern slope since the Carltons began diverting in the mid-1920s.  The Carltons did not own a reservoir in the Arkansas River Basin.  Instead, they rented storage space in the Sugarloaf Reservoir, owned by CF&I Steel Company.  The Carltons paid CF&I Steel a storage fee in volumes of water amounting to twenty percent of the water stored.

¶13     For many years, the Carltons leased the imported water to the High Line Canal Company, releasing water from storage as needed for supplemental irrigation.  In 1950,

---

[2] The conditional appropriations for Pan Ditch and Hidden Lake Creek Ditch were the subject of later diligence proceedings.  These conditional appropriations were decreed absolute in 1952 in Garfield County District Court Civil Action No. 4033.

10

the Carltons sold the Busk-Ivanhoe System water rights to the High Line Canal Company. The High Line Canal Company continued to store water in the Sugarloaf Reservoir. When the Sugarloaf Reservoir was later inundated and replaced by the Turquoise Reservoir during construction of the Fryingpan-Arkansas Project, the High Line Canal Company stored the imported water in the new reservoir through a contract with the Bureau of Reclamation. Like the Carltons, the High Line Canal Company paid for the storage in volumes of water.

¶14 In 1972, the High Line Canal Company sold an undivided one-half interest in the Busk-Ivanhoe System water rights to the Board of Water Works of Pueblo, Colorado ("Pueblo").[3] In 1984, Busk-Ivanhoe was incorporated and succeeded to the remaining one-half interest in the Busk-Ivanhoe System water rights. Between 1986 and 2001, Aurora purchased all of the capital stock of Busk-Ivanhoe, thereby acquiring the remaining one-half interest in the Busk-Ivanhoe System water rights.

¶15 In 1987, at Aurora's direction, Busk-Ivanhoe began putting its portion of the Busk-Ivanhoe System water rights to undecreed municipal use in the South Platte River Basin. To accomplish this, Busk-Ivanhoe diverted its water rights through the Ivanhoe Tunnel to the Turquoise Reservoir, where the water was stored. From there, the water was delivered through the Mount Elbert Conduit down to Twin Lakes Reservoir, through the Otero Pipeline to the Otero Pump Station, and pumped out of Water

---

[3] In 1993, Pueblo changed its interest in these water rights from irrigation to municipal use in Case No. 90CW340. Pueblo's one-half interest in the Busk-Ivanhoe System water rights is not at issue in this case.

11

Division 2 and into Aurora's storage facilities in Water Division 1. Busk-Ivanhoe continued to put the water to undecreed municipal use until 2009, and with the exception of one delivery during this twenty-two-year period, it did not apply the water to its decreed use for supplemental irrigation of lands in the Arkansas River Basin.

¶16 On December 30, 2009, at the request of the Division 2 Engineer, Busk-Ivanhoe filed an Application for Change of Water Rights with the clerk in Water Division 2 (the division where the water is imported) seeking to change the place of use of the water rights and to change the type of use from supplemental irrigation to municipal and domestic use.[4] Busk-Ivanhoe filed identical applications in Water Division 1 (the division where the water is being put to municipal use) and Water Division 5 (the division from which the water is exported). These cases were consolidated on May 7, 2010, in Water Division 2, and the water court held a five-day trial in July 2013.[5]

---

[4] The change application seeks to change the use of the Busk-Ivanhoe rights to include all municipal and domestic purposes, including but not limited to fire protection, sanitary, irrigation, commercial, manufacturing, mechanical and industrial use, recreational purposes, creation and maintenance of wetlands, stock watering, fish and wildlife propagation, allowable in-stream uses, if any, snowmaking, revegetation, storage and maintenance of storage reserves, and for augmentation, exchange and replacement purposes, together with the right to use, reuse, and successively use to extinction the water as foreign, imported water pursuant to section 37-82-106, C.R.S. (2016).

[5] Prior to trial, Busk-Ivanhoe filed a C.R.C.P. 56(h) motion with the water court, requesting legal determinations that: (1) the previous change of Pueblo's interest in the water rights constituted a legally binding system-wide quantification; (2) only changed circumstances would justify a reexamination of the quantification in that case; and (3) any required quantification must exclude periods of undecreed use as a matter of law and must not count years of undecreed use as zero-use years. In an April 18, 2013 Order Regarding the Motion for Determination of Questions of Law, the water court concluded that the 90CW340 Decree changing Pueblo's rights to municipal use was not

¶17     In its May 2014 Order, the water court quantified the historic consumptive use of the Busk-Ivanhoe water rights using a study period from 1928 through 1986, concluding that this was a representative period during which the rights were put to their decreed use. Notably, the water court excluded from the representative study period the twenty-two years of undecreed municipal and domestic use of the water rights from 1987 through 2009, reasoning that the study period must exclude undecreed uses.

¶18     The water court also concluded that, despite its silence regarding storage of the water on the eastern slope, the 2621 Decree included a component of lawful storage in the Arkansas River Basin. The court therefore included in its historic consumptive use quantification water stored on the eastern slope before being put to its decreed purpose. The court reasoned that the 2621 Decree's reference to "supplemental supply" evidenced an intent to use the water for supplemental irrigation when native flows in the Arkansas River Basin were insufficient to meet irrigation demands and concluded that storage was therefore necessary for the effective and beneficial use of the water rights. The court also surmised that certain references in the decree to "direct irrigation" that were stricken and replaced by handwritten references to "direct flow" suggested that exported water would not be used immediately for irrigation but instead might be stored. To support its conclusion that the intent of the original appropriation

---

a binding system-wide quantification and that the transmountain nature of the water rights did not preclude an analysis of beneficial use. Further, the water court declined to exclude, as a matter of law, the undecreed use from the quantification study period, concluding that this was a factual question better suited for determination after trial. The parties have not appealed this order.

included storage on the eastern slope, the water court also relied on certain extrinsic evidence not before the court in the 2621 Decree proceedings, namely, a map and statement filed with the State Engineer's Office that described a reservoir on the eastern slope that the Carltons had proposed but never built, and certain meeting minutes marketing the water as "reservoir water." As an additional basis for its ruling regarding storage on the eastern slope, the water court reasoned that the legal distinction between direct flow and storage rights does not apply to transmountain water, and thus, transmountain water may be stored even absent specific authorization in a decree.

¶19 Finally, the court also included in its historic consumptive use quantification the volumes of water used to pay for storage in the Sugarloaf and Turquoise Reservoirs, accepting the testimony of Busk-Ivanhoe's expert witness that storage on the eastern slope was needed to beneficially use the water and that the fees paid in volumes of water were akin to evaporation or transit losses.

¶20 Based on these conclusions, the water court quantified the transferable yield of the Busk-Ivanhoe water rights as 2,416 acre-feet per year. In its August 2014 Judgment and Decree, the court approved the change application with terms and conditions, and retained jurisdiction to reconsider any injury to vested water rights resulting from the change. This appeal followed.

## II. Standard of Review

¶21 We accept the water court's factual findings on appeal unless they are so clearly erroneous as to find no support in the record. Burlington Ditch Reservoir & Land Co. v.

Metro Wastewater Reclamation Dist., 256 P.3d 645, 660 (Colo.), as modified on denial of reh'g (June 20, 2011); S. Ute Indian Tribe v. King Consol. Ditch Co., 250 P.3d 1226, 1232 (Colo. 2011). "We review de novo the water court's legal conclusions, including its interpretation of prior decrees." Burlington Ditch, 256 P.3d at 661; see Simpson v. Bijou Irrigation Co., 69 P.3d 50, 58 (Colo.), as modified on denial of reh'g (May 27, 2003).

### III. Analysis

¶22 The right to change a water right is limited to that amount actually used beneficially pursuant to the decree at the appropriator's place of use. Widefield Water & Sanitation Dist. v. Witte, 2014 CO 81, ¶ 19, 340 P.3d 1118, 1124; Santa Fe Trail Ranches Prop. Owners Ass'n v. Simpson, 990 P.2d 46, 54 (Colo. 1999). Thus, in this initial change proceeding, the water court was required to quantify the historic consumptive use of Busk-Ivanhoe's decreed rights. The issues in this appeal concern the water court's quantification of those rights, specifically: (1) whether storage of the water on the eastern slope prior to use was lawful and therefore could be included in the water court's historic use quantification; (2) whether the volumes of water paid to rent such storage could be included in the quantification; and (3) whether the water court properly excluded the twenty-two years of undecreed municipal use from the representative study period used to quantify the rights.

¶23 The Western Slope Opposers argue that the 2621 Decree did not authorize storage of the Busk-Ivanhoe water rights on the eastern slope; therefore, the water court erred by including in its quantification water that was stored on the eastern slope before being put to beneficial use. The Western Slope Opposers further contend that, even if

15

Busk-Ivanhoe had the right to store water on the eastern slope before putting it to beneficial use, Busk-Ivanhoe did not have the right to sell or trade the water it did not use for irrigation. They contend that the volumes of water paid to rent such storage amounted to water diverted in excess of the decreed irrigation use that cannot be included in the quantification of the changed water rights. Finally, both the Western Slope Opposers and the Engineer Opposers maintain that the water court erred in excluding the twenty-two years of undecreed use from the representative study period when quantifying the Busk-Ivanhoe rights. Instead, Opposers argue, the years of undecreed municipal use in this case reflect non-use of the decreed rights for supplemental irrigation and should be treated as "zero-use" years when selecting a representative study period.

¶24 As context for our analysis, we provide a brief description of the core principles of Colorado's prior appropriation doctrine that apply to change proceedings. We then address each of the Opposers' contentions in turn. We hold as follows.

¶25 First, the water court erred when it concluded that storage of the Busk-Ivanhoe rights on the eastern slope prior to use for their decreed purpose was lawful. Under Colorado law, the right to store water is not an automatic incident of a direct flow right. This principle does not change simply because the diverted water is exported transmountain; the right to reuse and successively use imported water is not the equivalent of a right to store imported water without authorization <u>before</u> it is first applied to its decreed beneficial use. Thus, the right to store water in the basin of import prior to use is not an automatic incident of transmountain water rights, but

16

rather, must be reflected, or at least implied, in the decree. In this case, the 2621 Decree is silent with respect to storage of the water on the eastern slope prior to use for supplemental irrigation and the record does not support the water court's finding of an implied right in the decree for such storage. That the transmountain water was to be used for "supplemental" irrigation does not, without more, suffice to infer a separate right to store the water on the eastern slope before using it for that purpose, particularly here, where the decree expressly included storage on the western slope prior to export. And although a court may rely on extrinsic evidence such as the applicant's underlying statement of claim or testimony to construe or interpret a decree, here the petition and statement of claim upon which the 2621 Decree is based give no indication of the appropriators' intent to store on the eastern slope. On the facts of this case, we conclude that the water court erred by relying on other extrinsic evidence of the appropriators' intent to infer a separate storage right on the eastern slope because this evidence was not before the court in the 2621 proceedings and therefore could not have factored into the rights confirmed in the 2621 Decree. On remand, the water court must requantify the water rights subject to change; to the extent that unlawful storage of the water on the eastern slope expanded the decreed Busk-Ivanhoe rights, such amounts cannot be included in the historic use quantification of those rights.

¶26 Second, because storage of the subject water rights in the basin of import prior to use was unlawful, the water court erred in including the volumes of exported water paid as rental fees for storage on the eastern slope in its historic consumptive use quantification of the water rights.

¶27 Finally, the water court erred in concluding that it was required to exclude the twenty-two years of undecreed use of the subject water rights from the representative study period. In this case, the undecreed use did not represent expanded use of the decreed right for which an appropriator may not receive credit. Rather, the undecreed municipal use of the water occurred in lieu of its decreed purpose for supplemental irrigation. In other words, the period of undecreed use in this case reflects twenty-two years of non-use of the decreed rights. Because unjustified non-use of a decreed right should be considered when quantifying historic consumptive use for purposes of a change application, we remand the case to the water court to determine whether the years of non-use of the Busk-Ivanhoe rights for their decreed purpose were unjustified. If so, the water court should consider including the years of unjustified non-use in the representative study period as "zero-use" years for purposes of its historic consumptive use analysis. Accordingly, we reverse the water court's May 27, 2014, Order and August 15, 2014, Judgment and Decree and remand to Water Division 2 for further proceedings consistent with this opinion.

## A. General Principles of Change Proceedings

¶28 Under Colorado's doctrine of prior appropriation, a water right is a usufructuary right that affords its owner the right to use and enjoy a portion of the waters of the state. Colo. Const. art. XVI, § 6; § 37-92-103(12), C.R.S. (2016); Burlington Ditch, 256 P.3d at 661. One does not "own" water, but owns the right to use water within the limitations of this doctrine. Burlington Ditch, 256 P.3d at 661; see § 37-92-103(12); Kobobel v. Colo. Dep't of Nat. Res., 249 P.3d 1127, 1134 (Colo. 2011).

18

¶29 The touchstone of Colorado's prior appropriation doctrine is beneficial use. Widefield, ¶ 19, 340 P.3d at 1123. That is, an appropriator perfects a right to use water by applying a specified quantity of unappropriated water to a beneficial use. Empire Lodge Homeowners' Ass'n v. Moyer, 39 P.3d 1139, 1147 (Colo. 2001), as modified on denial of reh'g (Feb. 11, 2002). Section 37-92-103(4), C.R.S. (2016), defines "beneficial use" as "that amount of water that is reasonable and appropriate under reasonably efficient practices to accomplish without waste the purpose for which the appropriation is lawfully made."

¶30 Colorado water law has long recognized the right of water users to make changes to the terms of their decrees—including changes to the type, place, or time of beneficial use; changes to the points of diversion; changes to storage; and changes from direct flow to storage and subsequent application and vice versa. See § 37-92-103(5); High Plains A&M, LLC v. Se. Colo. Water Conservancy Dist., 120 P.3d 710, 718 (Colo.), as modified on denial of reh'g (Oct. 11, 2005). Permanent changes to a water right must be decreed through the adjudication process established by the legislature. V Bar Ranch LLC v. Cotten, 233 P.3d 1200, 1209 (Colo. 2010) (parties wishing to change the use of a water right must obtain a water court decree allowing the change in use); see § 37-92-305(3); High Plains A&M, 120 P.3d at 718.

¶31 "[I]t is inherent in the notion of a 'change' of water right that the right itself can only be changed and not enlarged." State Eng'r v. Bradley, 53 P.3d 1165, 1169 (Colo. 2002). This is a basic predicate of water law dating to the nineteenth century; a change application merely continues the rights decreed in the original appropriation in a new

form and may not expand the amount of water actually used under the original decree. ISG, LLC v. Ark. Valley Ditch Ass'n, 120 P.3d 724, 732 (Colo.), as modified on denial of reh'g (Oct. 11, 2005); Santa Fe Trail Ranches, 990 P.2d at 53 (citing Clesson S. Kinney, A Treatise on the Law of Irrigation 375 (1894)).  In other words, "the right to change a water right is limited to that amount of water actually used beneficially pursuant to the decree at the appropriator's place of use."  Santa Fe Trail Ranches, 990 P.2d at 54; see Weibert v. Rothe Bros., 618 P.2d 1367, 1371 (Colo. 1980).  Thus, in order to determine that a requested change of a water right is merely a change, and will not amount to an enlargement of the original appropriation, the court must quantify the historic use[6] of the right to some degree of precision.  Bradley, 53 P.3d at 1170.  Quantification of the amount of water beneficially consumed pursuant to the decree guards against rewarding wasteful practices or recognizing water claims that are not justified by the nature or extent of the appropriator's actual need.  Santa Fe Trail Ranches, 990 P.2d at 54–55.

¶32    An absolute decree confirms that a right of appropriation has vested; the decree entitles the appropriator to use that right through its decreed point of diversion in a specified amount, usually expressed as a flow rate (for a diversion right) or in acre-feet of water (for a storage right).  Williams v. Midway Ranches Prop. Owners' Ass'n, 938

---

[6] As we explained in Bradley, the term "historic use" refers to the "historic consumptive use," see, e.g., Farmers Reservoir & Irrigation Co. v. City of Golden, 44 P.3d 241, 247 (Colo. 2002), or "historic beneficial consumptive use," see, e.g., Empire Lodge, 39 P.3d at 1147, attributable to the appropriation of that quantity of water historically consumed by applying the water to its decreed beneficial use.  Bradley, 53 P.3d at 1169 n.9.

20

P.2d 515, 521 (Colo. 1997). However, because "the period and pattern of use are not known with certainty at the time a water right is adjudicated," the decreed flow rate at the decreed point of diversion is not the same as the matured measure of the water right. Id. at 522 (quoting Weibert, 618 P.2d at 1372). Rather, over an extended period of time, "a pattern of historic diversions and use under the decreed right for its decreed use at its place of use" will become the true measure of the mature water right for change purposes, typically quantified in acre-feet of water consumed. Farmers Reservoir & Irrigation Co. v. Consol. Mut. Water Co., 33 P.3d 799, 807 (Colo.), as modified on denial of reh'g (Nov. 13, 2001) (citing Midway Ranches, 938 P.2d at 521). Crucially, proper analysis of the historic consumptive use of a water right measures the amount of water both actually and lawfully used in accordance with the decree. Widefield, ¶ 21, 340 P.3d at 1124; see also Burlington Ditch, 256 P.3d at 662.

¶33    Because beneficial use defines the genesis and maturation of every appropriative water right in this state, we have held that every decree includes an implied limitation that diversions are limited to those sufficient for the purposes for which the appropriation was made. Santa Fe Trail Ranches, 990 P.2d at 54; Weibert, 618 P.2d at 1372. Importantly, the actual historic diversion for beneficial use may be less than the decreed rate because, for example, "that amount has simply not been historically needed or applied for the decreed purpose." Wolfe v. Sedalia Water & Sanitation Dist., 2015 CO 8, ¶ 21, 343 P.3d 16, 23; Bradley, 53 P.3d at 1169. Indeed, we have often observed that when an appropriator exercises the right to change a decreed water right, he runs the real risk that the right will be requantified at an amount less than his

21

original decree based on the actual historic consumptive use of the right. Bradley, 53 P.3d at 1170; Consol. Mut. Water Co., 33 P.3d at 815; Midway Ranches, 938 P.2d at 522; Pueblo W. Metro. Dist. v. Se. Colo. Water Conservancy Dist., 717 P.2d 955, 959 (Colo. 1986). In short, an initial change application reopens the original decree for determination of the true measure of the appropriative right's consumptive use draw on the river system. Ready Mixed Concrete Co. v. Farmers Reservoir & Irrigation Co., 115 P.3d 638, 646 (Colo.), as modified on denial of reh'g (July 18, 2005).

¶34 In sum, "the fundamental purpose of a change proceeding is to ensure that the true right—that which has ripened by beneficial use over time—is the one that will prevail in its changed form." Santa Fe Trail Ranches, 990 P.2d at 55. In this case, the overarching issue is whether the Busk-Ivanhoe rights to be changed to municipal and domestic use in Aurora have been accurately quantified. We now turn to the Opposers' challenges.

### B. Storage of the Water Rights in the Arkansas River Basin Prior to Use

¶35 The Western Slope Opposers' first issue concerns whether storage of the Busk-Ivanhoe rights on the eastern slope prior to use was lawful. Unlawful storage that effected an enlargement of the Busk-Ivanhoe rights cannot be included in the quantification of the rights for change purposes. See Widefield, ¶ 21, 340 P.3d at 1124.

¶36 It is undisputed that the Busk-Ivanhoe water rights were decreed for diversion from the Colorado River Basin, across the Continental Divide, for purposes of supplemental irrigation on 80,000 acres of land in the Arkansas River Basin on the eastern slope. As discussed above, the 2621 Decree includes priorities for direct flow

22

rights for waters from Ivanhoe Creek, Lyle Ditch, Pan Ditch, and Hidden Lake Creek Ditch as well as a priority for storage of 1,200 acre-feet of water in the Ivanhoe Reservoir on the western slope prior to export through the Ivanhoe Tunnel. Under the decree, both the direct flow water and the water released from storage in the Ivanhoe Reservoir is carried through the Ivanhoe Tunnel, where it is discharged into Lake Fork Creek and carried into the Arkansas River for use in supplemental irrigation on lands in the Arkansas River Basin. The 2621 Decree makes no reference to storage of the water on the eastern slope before it is applied to supplemental irrigation. Nevertheless, it is undisputed that, from the time it was first appropriated, transmountain water decreed to the Busk-Ivanhoe System has been stored in reservoirs on the eastern slope prior to being put to beneficial use.

¶37 The Western Slope Opposers contend that storage of the Busk-Ivanhoe water rights on the eastern slope represents an undecreed enlargement of the rights and, therefore, cannot be included in the quantification of those rights in this change proceeding. Busk-Ivanhoe responds that a separate storage right in the basin of import is not required for transmountain water, provided that the time and place of diversions under the decree remain unchanged in the basin of export. It further asserts that, even if a separate right for storage on the eastern slope was required, such a right was implied in the 2621 Decree.

¶38 The water court reviewed the 2621 Decree and concluded that it permitted storage of the Busk-Ivanhoe water rights in the Arkansas River Basin. May 2014 Order, ¶ 53. Because the 2621 Decree stated that the water rights were to be used for

supplemental irrigation on the eastern slope, and because supplemental supply was necessary only early or late in the irrigation season, the water court reasoned that without storage in the Arkansas River Basin, the imported water would not be available when it was needed for the decreed beneficial use. The water court found that storage of the water in the Arkansas Basin was necessary for the effective and beneficial use of the Busk-Ivanhoe rights, and that the references in the decree to "supplemental supply" reflected the original appropriators' intent to store the water in the basin of import. It concluded that such intent was understood by the court in Civil Action No. 2621 and reflected in its decree. Id. at ¶ 43.

¶39    To support its conclusion, the water court noted that references in the 2621 Decree to "direct irrigation" were stricken and replaced with handwritten references to "direct flow"; the court reasoned that these alterations suggested that the water court in the 2621 proceedings understood that the original appropriators would not apply the water directly to irrigation on the eastern slope but might instead store it first. Id. at ¶ 44. In addition, the water court relied on extrinsic evidence of the appropriators' intent that was not presented to the water court in the 2621 proceedings, specifically, a map and statement filed with the State Engineer's Office in 1925 by L.G. Carlton that described a reservoir the Carltons proposed to build on the eastern slope upstream of the Sugarloaf Reservoir. Id. at ¶¶ 38, 46. The water court also pointed to minutes from meetings between an agent of the Carltons and the High Line Canal Company marketing the water as "reservoir water." Id. at ¶ 47. Contracts later entered into

24

between the Carltons and the High Line Canal Company also described the water as "storage water." Id.

¶40 Finally, the water court reasoned that the 2621 Decree was silent regarding storage on the eastern slope because under the law that existed in 1928, the Garfield County District Court had no authority to adjudicate a water right in the Arkansas River Basin, outside of Water District 38. Id. at ¶ 50.

¶41 As an additional basis for its ruling, the water court pointed to the administrative practice of allowing storage of transmountain water in the Arkansas River Basin, citing reports and accounting forms from the Division 2 Engineer and State Engineer. Id. at ¶ 51. The court reasoned this practice reflected an understanding of the law permitting storage of transmountain water even absent specific authorization in a decree. The court reasoned that "the distinction between direct flow and storage rights applied to native water rights is not applicable after export to an unconnected river system." Id. at ¶ 52. Finally, the water court concluded that the lawful storage of the subject water rights did not amount to an expansion of the Busk-Ivanhoe rights and therefore should be included in the historic consumptive use quantification. Id. at ¶¶ 56–61.

¶42 As discussed below, we disagree with Busk-Ivanhoe and the water court that transmountain water, by its very nature, may be stored absent authorization prior to being put to beneficial use. That transmountain water may be reused or successively used to extinction in the basin of import _after_ being applied to its decreed beneficial use is not the equivalent of a right to store the diverted water without authorization _before_ it is put to its decreed beneficial use. The right to store water in the basin of import

25

prior to use is not an automatic incident of transmountain water rights, but rather, must be reflected, or at least implied, in the decree.

¶43　We further disagree that a right to store the Busk-Ivanhoe water rights on the eastern slope may be implied from the 2621 Decree and its underlying pleadings. The 2621 Decree makes no reference at all to storage of the water on the eastern slope before being used for supplemental irrigation. And although a court may rely on extrinsic evidence such as the applicant's underlying statement of claim or testimony to construe or interpret a decree, here the petition and statement of claim upon which the 2621 Decree is based give no indication of the appropriators' intent to store on the eastern slope. On the facts of this case, we conclude that the water court erred by relying on other extrinsic evidence of the appropriators' intent to infer a separate storage right on the eastern slope because this evidence was never presented to the water court in the 2621 Decree proceedings and could not have formed the basis of its supposed recognition of the appropriators' intent to store the water on the eastern slope.

¶44　To the extent that unlawful storage on the eastern slope expanded the decreed Busk-Ivanhoe rights, such amounts cannot be included in the historic use quantification of those rights, and the water court erred in including such water in its quantification of the historic consumptive use of the Busk-Ivanhoe rights. On remand, the water court must determine to what extent the undecreed storage of the Busk-Ivanhoe rights on the eastern slope prior to using the water for its decreed purpose caused an unlawful expansion of the decreed rights.

## 1. The Right to Store Water in the Basin of Import Prior to Use is not an Automatic Incident of Transmountain Water Rights

¶45    Colorado water law has long recognized a distinction between the right to use the direct flow of natural waters and the right to store those waters for future use. City of Thornton v. Bijou Irrigation Co., 926 P.2d 1, 27 n.12 (Colo. 1996); Handy Ditch Co. v. Greeley & Loveland Irrigation Co., 280 P. 481, 481 (Colo. 1929). "[A]n appropriation for one type of right does not encompass the other type." Bijou Irrigation, 926 P.2d at 27 n.12.

¶46    The right to store water is not an automatic incident of a direct flow right. Id. This is because whether the water diverted pursuant to a decree is used immediately or stored for future use affects the potential impact of the diversion on other water users. Id. A direct flow right may be diverted in priority only when the water can be directly applied to its decreed beneficial use; it is therefore limited by stream conditions and by the extent of the need for the beneficial use at the time of diversion. By contrast, a storage right allows its holder to divert water in priority whenever the water is available and to store that water until it is needed for its decreed beneficial use. Storage of a direct flow water right can increase consumption by permitting the diversion of available water not immediately needed for beneficial use—water that would otherwise be left in the stream for junior water users. Thus, for water to be held in a reservoir for later use, a storage decree must be sought. City & Cty. of Denver v. N. Colo. Water Conservancy Dist., 276 P.2d 992, 999 (Colo. 1954); see also Greeley & Loveland Irrigation Co. v. Farmers Pawnee Ditch Co., 146 P. 247, 248 (Colo. 1915) (recognizing

that a direct flow right for irrigation did not entitle the appropriator to divert and store water).

¶47    This change application, however, concerns transmountain water, which is treated differently than native water for some purposes.  As a general rule, appropriators of water native to a public stream have no automatic right to capture and reuse such water after applying it to beneficial use.  Rather, any surplus remaining after use must be returned to the stream system to be made available to other users.  Bijou Irrigation, 926 P.2d at 65.  Indeed, in a change case involving native waters, the court will consider the impact on return flows when assessing whether the proposed change will cause injury to other vested rights.  See Se. Colo. Water Conservancy Dist. v. Ft. Lyon Canal Co., 720 P.2d 133, 146–47 (Colo.), as modified on denial of reh'gs (July 14, 1986).

¶48    A different rule has developed with respect to imported water.  Specifically, importers of transmountain water may reuse or make successive uses[7] of the imported water to the extent that its volume can be distinguished.  § 37-82-106(1), C.R.S. (2016); see also Bijou Irrigation, 926 P.2d at 67; City of Florence v. Bd. of Waterworks of Pueblo, 793 P.2d 148, 153–54 (Colo. 1990).  Importers of foreign water are accorded wide latitude as to the use and disposal of the water in the basin of import in order to allow the flexible and efficient use of foreign water and to minimize the amount of water

---

[7] "Reuse" means a subsequent use of imported water for the same purpose as the original use; "successive use" means subsequent use of the water by the importer for a different purpose.  City & Cty. of Denver v. Fulton Irrigating Ditch Co., 506 P.2d 144, 146–47 (Colo. 1972).

imported from the western slope. <u>City of Florence</u>, 793 P.2d at 154; <u>City & Cty. of Denver v. Fulton Irrigating Ditch Co.</u>, 506 P.2d 144, 148 (Colo. 1972). This approach recognizes that absent the importer's efforts, the water would never have been in the basin of import and available for use to begin with. <u>Bijou Irrigation</u>, 926 P.2d at 68; <u>see also</u> <u>City of Florence</u>, 793 P.2d at 154. Accordingly, other appropriators in the basin of import do not acquire vested rights in return flows from transmountain water.

¶49    However, the right to reuse and successively use imported water is not the equivalent of a right to store imported water without authorization <u>before</u> it is first applied to its decreed beneficial use. We hold that, just as the right to store water is not an automatic incident of a direct flow right, <u>Bijou Irrigation</u>, 926 P.2d at 27 n.12, the right to store water in the basin of import <u>prior</u> to use is not an automatic incident of transmountain water rights. As discussed above, storage of a decreed direct flow right can potentially expand that right by permitting the diversion of available water not immediately needed for beneficial use—water that would otherwise be left in the stream for junior water users. This impact on junior users does not cease to exist just because the water is diverted for export to another basin. Junior users in the basin of export have a right to divert and use water not lawfully diverted in the first place under a senior water right, regardless of whether that water is diverted for transmountain use. <u>Cf.</u> <u>Navajo Dev. Co. v. Sanderson</u>, 655 P.2d 1374, 1377 (Colo. 1982) ("Unused . . . water will be discharged back into the river system or otherwise recycled and therefore is available for use by other appropriators.").

¶50 We therefore reverse the water court to the extent it relied on the transmountain nature of the subject water rights to justify inclusion of water stored on the eastern slope in its historic use quantification.[8] We must now determine whether storage of the Busk-Ivanhoe water rights on the eastern slope prior to use was implied in the 2621 Decree.

## 2. Storage in the Basin of Import Prior to Use Was Not Implied in the 2621 Decree

¶51 A water court has authority to determine a prior decree's setting, intent, meaning, and effect when adjudicating a change application or ascertaining the existence of an undecreed enlargement of a decreed water right. Burlington Ditch, 256 P.3d at 660. In so doing, a court may examine documents and take evidence regarding the facts and circumstances concerning the entry of the decree. In re Tonko, 154 P.3d 397, 405 (Colo. 2007). Specifically, because the scope of a water right is defined by the intent of the appropriator at the time of appropriation, see V Bar Ranch, 233 P.3d at 1208, we have consistently held that an applicant's statement of claim and the transcripts of testimony in adjudication proceedings are admissible evidence in other actions involving the construction or interpretation of water decrees. In re Water Rights of Cent. Colo. Water Conservancy Dist. ("Jones Ditch"), 147 P.3d 9, 16–17 (Colo. 2006); Drach v. Isola, 109 P. 748, 751 (Colo. 1910) ("[T]he pleadings or statements of claim

_____

[8] To the extent the water court relied on reports and accounting forms from the Division 2 Engineer and State Engineer reflecting acquiescence in the storage of transmountain water in the Arkansas River Basin, May 2014 Order, ¶ 51, we note that such acquiescence does not substitute for judicial determination of water rights. See Empire Lodge, 39 P.3d at 1156–57.

30

upon which the decree is based may be considered along with the decree, in ascertaining its meaning.").

¶52 A water decree is a determination of a specific issue presented to the court by the applicant's statement of claim. Orchard City Irrigation Dist. v. Whitten, 361 P.2d 130, 134 (Colo. 1961). We have long recognized that the applicant's statement of claim is akin to a pleading upon which judgment is based, and may be consulted to enable the court to interpret or constrain the decree "in light of the claimant's own assertion of his demand." Jones Ditch, 147 P.3d at 16–17 (quoting New Mercer Ditch Co. v. Armstrong, 40 P. 989, 990 (1895)); see also Orchard City, 361 P.2d at 134 (observing that a decree must be construed in light of the facts that gave it birth and must be limited by the issue presented in the statement of claim) (citing Hinderlider v. Canon Heights Irrigation & Reservoir Co., 185 P.2d 325, 327 (Colo. 1947)).

¶53 Importantly, the water court's decree "measure[s], limit[s] and define[s] both the nature and extent of [the holder's] rights"; thus, any "asserted right must be found in the decree[] or result from a proper and legal construction thereof." Orchard City, 361 P.2d at 135–36. In short, if an asserted right exists, it must be found in the language of the decree or at least "implied from the express provisions of the decree[]." Id. at 136.

¶54 In this case, the 2621 Decree adjudicates a storage right for 1,200 acre-feet of water in the Ivanhoe Reservoir on the western slope prior to export. Yet the 2621 Decree contains no reference to storage of the Busk-Ivanhoe System rights on the eastern slope before such water is put to beneficial use. To the contrary, the language of the 2621 Decree repeatedly states that both the direct flow water and the water released

31

from storage in the Ivanhoe Reservoir, once exported, will be released into Lake Fork Creek "and thence into the Arkansas River," from which it will be diverted for irrigation of lands in the Arkansas River Basin.

¶55 The Carltons' petition and statement of claim underlying the 2621 Decree likewise claims a storage right only in the Ivanhoe Reservoir on the western slope, and nowhere suggests that, as part of the appropriation, the Carltons intended to store the water on the eastern slope before using it for irrigation:

> The water diverted into said Ivanhoe Reservoir as hereinabove set forth is and will be released therefrom by claimant at will and carried through said Ivanhoe Tunnel and discharged into said Lake Fork Creek down which it has and will be allowed to flow into the Arkansas River and from thence into the headgates of various ditches and canals along said Arkansas River where said water has been and will be beneficially used in the irrigation of lands in the State of Colorado lying under said ditches and canals which are insufficiently supplied with water under the priorities appertaining directly to said ditches and canals.

Carlton Statement of Claim, ¶ 4 (emphasis added). Thus, neither the 2621 Decree nor the petition and statement of claim contain language from which an intent to store water on the eastern slope may be implied.

¶56 The water court reasoned that references in the Decree to the "supplemental" or "additional" supply of water reflected a need for the water either early or late in the irrigation season. The court thus found that storage on the eastern slope was "necessary for the effective and beneficial use of the Busk-Ivanhoe water rights," and that the intent to store the water in the basin of import was therefore "part of the original appropriation," and "reflected in [the] decree." May 2014 Order, ¶ 43. However, the mere need for storage does not, without more, establish a right to store

32

water. In any event, to the extent that the references to "supplemental" or "additional" supply of water suggested a need for storage, the 2621 Decree in fact decreed storage—in the Ivanhoe Reservoir on the western slope. Such references do not, however, without more, support an implied right to additional storage on the eastern slope.

¶57 The water court also reasoned that references to "direct irrigation" in the 2621 Decree that were stricken and replaced by handwritten references to "direct flow" suggested that exported water would not be used immediately for irrigation but instead might be stored. We disagree. If anything, these interlineations appear to be corrections made to accurately describe the "direct flow" rights decreed for waters from Ivanhoe Creek, Lyle Ditch, Pan Ditch, and Hidden Lake Creek Ditch. See 2621 Decree at 8–9.

¶58 Looking beyond the language of the decree, the water court turned to extrinsic evidence of the appropriators' intent that was not before the water court in the 2621 proceedings. May 2014 Order, ¶ 38. Specifically, the water court relied on a map and statement that L.G. Carlton filed in 1925 with the State Engineer's Office describing a proposed reservoir on the eastern slope upstream of the Sugarloaf Reservoir. Id. at ¶ 46. Although this reservoir was never constructed, the water court found that this filing reflected the Carltons' intent to store the water derived from the Busk-Ivanhoe System in the Arkansas River Basin and that this intent was later effectuated instead through the storage of the water in the Sugarloaf Reservoir, among others. Id. The water court also relied on minutes from meetings between an agent of the Carltons and the High Line Canal Company that took place before the statement of claim was filed in Civil

33

Action No. 2621, in which the Carltons' agent represented that the water was stored in reservoirs on the eastern slope. Based on these minutes and other contracts from that general time frame referring to the water rights as "storage water," the water court found that, at least as early as 1926, the Busk-Ivanhoe water was marketed to potential buyers as "reservoir water." Id. at ¶ 47. These factual circumstances, the water court concluded, evinced the parties' intent to store some of the water on the eastern slope before using it for supplemental irrigation.

¶59 As discussed above, although the scope of a water right is defined by the intent of the appropriator at the time of appropriation, see V Bar Ranch, 233 P.3d at 1208, it is the water court's decree that "measure[s], limit[s] and define[s] both the nature and extent of [the holder's] rights." Orchard City, 361 P.2d at 135–36. The decree, therefore, reflects the judicial confirmation of the appropriator's intent because it is founded on the claimant's own assertion of his demand. See Jones Ditch, 147 P.3d at 16–17. Here, the water court erred by relying on this particular extrinsic evidence of the appropriators' intent because the Carltons' statement of claim in the 2621 Decree proceedings contains no reference to any of it, and such evidence was not otherwise presented to the Garfield County District Court in the 2621 Decree proceedings. Thus, it could not have formed the basis of that court's supposed recognition of a storage right on the eastern slope in the 2621 Decree. Consequently, under the circumstances of this case, this extrinsic evidence cannot support an implied right to store water on the eastern slope in the 2621 Decree.

34

¶60    Finally, we acknowledge that under the 1921 laws in effect when the 2621 Decree issued, the Garfield County District Court did not have jurisdiction to adjudicate water rights in the Arkansas River Basin, outside of Water District 38. But the 2621 Decree did not purport to adjudicate priorities for Arkansas River Basin waters. Rather, it properly decreed rights to water being diverted from streams in Water District 38. In so doing, the 2621 Decree described how that water would be delivered to, and ultimately used in, the Arkansas River Basin. The problem here is that the 2621 Decree and the statement of claim upon which it is based do not even hint at storage of the water on the eastern slope before it is used for irrigation.

¶61    In sum, we conclude that storage of the Busk-Ivanhoe rights on the eastern slope prior to storage was unlawful. Because undecreed storage of a direct flow water right may amount to an expansion of that right, any expansion of the Busk-Ivanhoe water rights resulting from the unlawful storage of those rights on the eastern slope cannot be included in an historic consumptive use analysis. Cty. of Boulder v. Boulder & Weld Cty. Ditch Co., 2016 CO 17, ¶ 34, 367 P.3d 1179, 1188 (water used on acreage other than that for which the appropriation was made constitutes an unlawful enlargement of use and cannot be included in a calculation of historic consumptive use even where the enlarged use has persisted for a long time); Jones Ditch, 147 P.3d at 14 ("[A] water right decreed for irrigation purposes cannot lawfully be enlarged beyond the amount of water necessary to irrigate the lands for which the appropriation was made."). Accordingly, on remand, the water court must determine to what extent storage of the Busk-Ivanhoe rights on the eastern slope prior to using the water for its decreed

35

purpose caused an unlawful expansion of the decreed right. In conducting its historic consumptive use analysis, the water court should exclude the amounts, if any, by which the rights have been expanded by the unlawful storage.

### C. Payment in Volumes of Water for Storage in the Arkansas Basin

¶62 The water court also included in its quantification of the Busk-Ivanhoe water rights the volumes of water Busk-Ivanhoe used to pay for storage on the eastern slope. Busk-Ivanhoe argues that payment of storage fees with imported water was part of the original appropriation of the water rights, and that water paid for storage is analogous to evaporative or transit losses that can be included in the historic use quantification of the water rights.

¶63 The Western Slope Opposers contend that because storage of the Busk-Ivanhoe rights in the Arkansas River Basin was unlawful, the percentage of that stored water paid to rent storage was necessarily also unlawful. Accordingly, they contend, the volumes of water used to pay for storage should not be included in the historic use quantification. The Western Slope Opposers further contend that, even if Busk-Ivanhoe had the right to store water on the eastern slope before putting it to beneficial use, it did not have the right to sell or trade the water it did not use for irrigation. The volumes of water paid as a storage fee cannot be claimed as part of the quantification of the right, Opposers claim, because that water was not put to its decreed beneficial use. Thus, they contend, the volumes of water paid to rent such storage amounted to water diverted in excess of the decreed irrigation use and cannot be included in the quantification of the changed water rights.

¶64 The water court concluded that the Western Slope Opposers' arguments were based on the premise that storage of the water in the Arkansas Basin was illegal. Because the water court disagreed with that premise, and because it accepted Busk-Ivanhoe's expert's testimony that the fees were necessary to store the water, it included the volumes of water paid for storage on the eastern slope in its historic consumptive use calculation. However, because we conclude that storage on the eastern slope was unlawful, we hold that the water court erred in including the volumes of water used to pay for storage on the eastern slope in its quantification of the Busk-Ivanhoe rights.

## D. Treatment of Periods of Undecreed Use of the Water Rights

¶65 It is undisputed that from 1987 through 2009, Aurora put the Busk-Ivanhoe supplemental irrigation water rights to undecreed municipal uses without seeking a change decree to authorize such use. Citing Santa Fe Trail Ranches, 990 P.2d at 52, and Burlington Ditch, 256 P.3d at 665, the water court concluded that, because undecreed use cannot be the basis of a quantification analysis, it was required to exclude the twenty-two-year period of undecreed use from the representative study period in this case. May 2014 Order, ¶¶ 75, 81, 84. The court therefore selected 1928 through 1986 as the representative study period, excluding the years of undecreed municipal use from 1987 through 2009 from its quantification. The Western Slope Opposers and the Engineer Opposers contend that the water court erred in reasoning that it was required to exclude the twenty-two years of undecreed use from the representative study period. We agree.

37

¶66 "[T]he right to change a water right is limited to that amount of water consumed beneficially over a representative historical period of time by use pursuant to the decree at the appropriator's place of use." Ready Mixed Concrete, 115 P.3d at 645–46. An applicant in a change proceeding bears the burden to establish "actual usage of an appropriation for its decreed use at its place of use," and must identify the extent of its actual beneficial use. Santa Fe Trail Ranches, 990 P.2d at 55, 57.

¶67 Over an extended period of time, a pattern of historic diversions and use of the decreed right at its decreed place of use becomes the measure of the mature right. Sedalia, ¶ 21, 343 P.3d at 23; Midway Ranches, 938 P.2d at 521. This measure becomes the transferable yield of a water right in a change case. As the water court correctly noted, the purpose of selecting a representative study period is to ensure that the quantification accurately measures the historic consumptive use of water that the applicant is entitled to change. May 2014 Order, ¶ 64.

¶68 The question here is how the twenty-two-year period of undecreed use should be treated when selecting the representative study period used to quantify the Busk-Ivanhoe rights. In Burlington Ditch, we made clear that water derived from the unlawful expansion of use cannot be included in the quantification of the right, even if there has been a long period of enlarged use. 256 P.3d at 662–63. In that case, the water court's study period was chosen to reflect the Burlington Company's legal use of its direct flow rights under an 1885 decree; that study period properly excluded subsequent years in which Farmers Reservoir & Irrigation Company had unlawfully enlarged that direct flow right. Id. at 665–66.

¶69 We have also made clear, however, that non-use of a water right has an important bearing on quantification in a change proceeding. See Trinchera Ranch Co. v. Trinchera Irrigation Dist., 266 P. 204, 209 (Colo. 1928). Indeed, "[p]rolonged unjustified nonuse calls into question the appropriate representative period of time for calculating the annual average consumptive use amount and therefore, the amount legally available for the subsequent change decree." Sedalia, ¶ 34, 343 P.3d at 27.

¶70 Busk-Ivanhoe argues that the water court properly excluded the years of undecreed use from the representative historic period. It asserts that including years of undecreed use in the representative period and treating those years as "zero-use" years would be punitive, which, in its view, is not the purpose of a change proceeding. Opposers, on the other hand, contend that the years of undecreed use from 1987 to 2009 should be considered in the representative study period as "zero-use" years of the lawfully decreed rights. Opposers argue that excluding the years of undecreed use from the representative period in this case effectively excuses unlawful use and fails to incentivize timely change applications.

¶71 We conclude that the water court erred in concluding that it was required to exclude the periods of undecreed use from the representative study period. In this case, the undecreed use did not represent expanded use of the decreed right for which an appropriator may not receive historic use credit. Rather, here, the water was used for undecreed municipal purposes in lieu of its decreed purpose for supplemental irrigation. Consequently, the period of undecreed use in this case reflects twenty-two years of non-use of the decreed rights for their decreed purpose. Because unjustified

39

non-use of a decreed right should be considered when quantifying historic consumptive use for purposes of a change application, see Sedalia, ¶ 34, 343 P.3d at 27, the water court should have considered including any years of unjustified non-use of the decreed water rights as "zero-use" years when selecting a representative study period. By omitting years of unjustified non-use from a representative study period, the average annual historic use is artificially inflated, thereby effectively giving credit for the undecreed use in the quantification of the right.

¶72 We remand the case to the water court to determine whether the years of undecreed use of the Busk-Ivanhoe water rights were unjustified. If so, the water court should consider including the years of unjustified non-use in the representative study period as "zero-use" years for purposes of its historic consumptive use analysis.

## IV. Conclusion

¶73 In sum, we hold that the water court erred in concluding that storage of the Busk-Ivanhoe water rights on the eastern slope prior to use for supplemental irrigation was lawful. On remand, the water court must determine the extent to which storage of the water on the eastern slope prior to use caused an unlawful expansion of Busk-Ivanhoe's water rights, and may not include such amounts in the historic use quantification. In addition, because storage of the subject water rights on the eastern slope was unlawful, the water court erred in including the volumes of water paid for storage in eastern slope reservoirs in its historic use quantification. Finally, the water court erred in concluding that it was required to exclude the years of undecreed use of the subject water rights from the representative study period. Instead, it should

consider including the years of unjustified non-use in the representative study period as "zero-use" years for purposes of its historic consumptive use analysis. Accordingly, we reverse the water court's May 27, 2014, Order and August 15, 2014, Judgment and Decree and remand to Water Division 2 for further proceedings consistent with this opinion.

**CHIEF JUSTICE RICE** dissents in part and concurs in part, and **JUSTICE HOOD** joins in the dissent in part and concurrence in part.

CHIEF JUSTICE RICE, dissenting in part and concurring in part.

¶74 The majority concludes that the water court erred when it: (1) concluded that storage of the Busk-Ivanhoe rights on the eastern slope prior to use was lawful; (2) included the volumes of exported water paid as rental fees for storage on the eastern slope in its historic consumptive use quantification of the water rights; and (3) concluded that it was required to exclude the twenty-two years of undecreed use of the subject water rights from the representative study period. Maj. op. ¶¶ 7–9. In my view, however, the storage on the eastern slope prior to use was lawful because it was within the scope of the appropriation and the storage did not expand the original water right. Because I would conclude that the storage of the Busk-Ivanhoe rights on the eastern slope was lawful, paying for this storage in volumes of water was therefore also lawful such that the volumes of water paid for storage were properly included in the quantification analysis. However, I agree with the majority that the water court erred in concluding that it was required to exclude the periods of undecreed use from the representative study period. Accordingly, I respectfully dissent in part and concur in part.

## I. Storage of the Water Rights in the Arkansas River Basin Was Lawful

¶75 While I agree with the majority's general conclusion that transmountain water rights by their nature do not necessarily include a storage right or automatically justify inclusion of stored water in a historic consumptive use quantification, I disagree with the majority's ultimate conclusion that storage of the Busk-Ivanhoe rights on the eastern slope prior to use was unlawful. See maj. op. ¶¶ 46, 61. Instead, I would conclude that

1

eastern slope storage was lawful for the purposes of the change application in this specific instance because storage was within the scope of the original appropriation and did not expand the original water right. As such, the water court properly included the stored water in its quantification of the historic consumptive use of the Busk-Ivanhoe rights.

### A. Eastern Slope Storage was Within the Scope of the Appropriation

¶76 The scope of a water right is defined by the intent of the appropriator at the time of appropriation. V Bar Ranch LLC v. Cotten, 233 P.3d 1200, 1208 (Colo. 2010). To determine the scope of the Busk-Ivanhoe right, the water court took evidence regarding the intent of the Carltons, the original appropriators, and determined the weight to give that evidence in analyzing the circumstances surrounding entry of the 2621 Decree. It found as a matter of fact, based on evidence, including statements and filings made prior to the Decree, that the Carltons always contemplated storage of the Busk-Ivanhoe water rights as a part of the appropriation. Accordingly, the water court held that the intent to store on the eastern slope prior to use was part of the original appropriation and that such intent was understood by the court and reflected in its decree.

¶77 Specifically, the water court found that approximately three years prior to the filing of the Carlton's petition in Case 2621, L.G. Carlton filed a Map and Statement for Lake Fork Reservoir on the eastern slope. Although the reservoir was never constructed, it was intended to be on Lake Fork Creek, a short distance upstream from Sugarloaf Reservoir, where the water was eventually stored instead. The water court found that this filing reflected the Carltons' intent to store the water derived from the

2

Busk-Ivanhoe System in the Arkansas River Basin, and that this intent was instead later effectuated through the storage of the water in the Sugarloaf Reservoir, among others. The water court also noted that, prior to the 2621 Decree, an agent of the Carltons attended a meeting during which he offered to sell a one-half interest in the Busk-Ivanhoe System to the High Line Canal Company. According to the meeting minutes, the agent represented that the water in the Busk-Ivanhoe System was brought through the Ivanhoe Tunnel and stored in Sugarloaf Reservoir and Clear Creek Reservoir. Based on this and other contracts from that time referring to the water rights as "storage water," the water court found that, at least as early as 1926, the Busk-Ivanhoe water was marketed to potential buyers as "reservoir water."

¶78 The water court further found that storage of the Busk-Ivanhoe water in the Arkansas Basin on the eastern slope was necessary for the effective and beneficial use of the Busk-Ivanhoe water rights as decreed in the 2621 Decree. Undisputed evidence before the water court established that in the Arkansas River Basin, water rights junior to 1887 were highly unreliable. Thus, except for very senior rights, the natural flows of the Arkansas River were inadequate to meet crop demands early in the irrigation season and from mid-summer through the end of the irrigation season. Therefore, the water court determined that without additional storage in the Arkansas Basin, most of the water produced by the Busk-Ivanhoe System would not be available at the time needed to provide a supplemental irrigation supply.

¶79 Given this, I would conclude that under the facts of this case, storage was necessary to effectuate the lawfully decreed irrigation rights. As such, the fact that

3

Busk-Ivanhoe did not have a separate decree for storage of water on the eastern slope is immaterial to the question of whether the storage was within the scope of the decree — and by extension to whether the storage was lawful. The water at issue had been lawfully appropriated under the 2621 Decree. Once the water crossed through the Ivanhoe Tunnel onto the eastern slope and into the Arkansas Basin, it was lawfully appropriated water that existed independent of the priority system. See City of Thornton v. Bijou Irrigation Co., 926 P.2d 1, 66 n.59 (Colo. 1996). No water user in the basin of import could make any claim to it while the water was in the basin, see Pub. Serv. Co. of Colo. v. Willows Water Dist., 856 P.2d 829, 833 (Colo. 1993), because none of these users had any rights to the transmountain water, see City of Florence v. Bd. of Waterworks, 793 P.2d 148, 153 (Colo. 1990). Instead, the importers were entitled to the "fruits of their labors," Bijou Irrigation, 926 P.2d at 66 n.59, accorded wide latitude as to the use and disposal of the appropriated water, and could change "the time, place or manner in which these waters [were] used, even if junior appropriators [were] adversely affected," City of Florence, 793 P.2d at 154. As such, Busk-Ivanhoe could store the water without a separately decreed priority because the water existed apart from the priority system of the eastern slope and storage only affects the "time, place, or manner" of use. Id. It follows, then, that a further decreed right to store water in the Arkansas Basin was not necessarily needed in this case.

¶80 Additionally, that storage was not expressly decreed in the 2621 Decree does not undermine my conclusion that storage on the eastern slope was within the scope of the appropriation. As the water court correctly concluded, the scope of a water court's

4

authority under Colorado statutes as they existed in the 1920s explains this omission. This decree was issued under the 1921 Act. It is undisputed that the 1921 Adjudication Laws limited a district court's authority to adjudicate water rights to a single water district: "any one or more persons, associations or corporations, interested as owners of any ditch, canal or reservoir in any water district shall present to the district court of any county having jurisdiction of priority of rights to the use of water for irrigation in such water district . . . ." 1921 Compiled Laws of Colorado § 1760, C.L. (1921) (emphasis added). The Busk-Ivanhoe water rights were adjudicated in 1928 in the Garfield County District Court, which was within Water District 38. Under the 1921 Act, the Garfield County District Court did not have authority in 1928 to adjudicate a priority for the storage of water on the eastern slope because any eastern slope reservoir was not a reservoir "in such district" as required under the 1921 Adjudication Laws. See id. This limit on the District Court's authority explains why storage on the eastern slope, while part of the appropriators' plan and intent in adjudicating transmountain diversion rights for supplemental irrigation, was not explicitly described in the Decree.

¶81 Moreover, because the decree was silent as to eastern slope storage, the water court here acted well within its broad authority in examining various documents to determine the intent of the Carltons in appropriating the Busk-Ivanhoe water for transmountain diversion and use and related storage on the eastern slope. When a water court is presented with a decree that does not address the issue in question, the decree is silent. In re Water Rights of Cent. Colo. Water Conservancy Dist. ("Jones Ditch"), 147 P.3d 9, 16 (Colo. 2006). A decree that is silent on a specific point permits

5

the consideration of surrounding facts and circumstances to determine the intent of parties and the meaning of the decree. In re Tonko, 154 P.3d 397, 405 (Colo. 2007); see Cherokee Metro. Dist. v. Simpson, 148 P.3d 142, 146–47 (Colo. 2006). Determining the meaning of a decree includes ascertaining the scope of the water right. Jones Ditch, 147 P.3d at 16; V Bar Ranch, 233 P.3d at 1207. The scope of a water right is defined by the intent of the appropriator at the time of appropriation. V Bar Ranch, 233 P.3d at 1208. Therefore, when, as here, a decree is silent on the issue in question, it is appropriate for a water court to consider evidence about the intent of the appropriator at the time of the appropriation relative to the issue in question. See Jones Ditch, 147 P.3d at 16.

¶82    More broadly, water courts may "construe and make determinations regarding the scope of water rights adjudicated in prior decrees" because doing so is "consistent with the fundamental principle that adjudications of water rights have as their object the confirmation of pre-existing rights." S. Ute Indian Tribe v. King Consol. Ditch Co. ("Southern Ute"), 250 P.3d 1226, 1234 (Colo. 2011). While a decree should be "complete and certain in itself," a "decree is not woven of thin air . . . . It is grounded on the facts creating that issue." Hinderlider v. Canon Heights Irrigation & Reservoir Co., 185 P.2d 325, 327–28 (Colo. 1947). Additionally, a water court has the authority to determine a decree's setting, intent, meaning, and effect when "ascertaining the existence of an undecreed enlargement of a decreed right." Burlington Ditch Reservoir & Land Co. v. Metro Wastewater Reclamation Dist., 256 P.3d 645, 660 (Colo. 2011); see also Southern Ute, 250 P.3d at 1234. Relatedly, it also has the authority to "examine documents and take evidence about the facts and circumstances surrounding entry of a decree, in order

6

to determine the decree's setting, intent, meaning, and effect . . . ." In re Tonko, 154 P.3d at 405.

¶83 Given this broad authority, I disagree with the majority that it was improper both for the water court to have considered extrinsic evidence apart from only the petition and statement of the claim in determining the Carltons' intent and to have relied on evidence that was not before the Garfield Court in the 2621 proceedings. See maj. op. ¶ 43. Instead, I would conclude that because the scope of a water right is defined by the intent of the appropriator at the time of the appropriation, V Bar Ranch, 233 P.3d at 1208, the water court properly considered the evidence before it regarding the intent of the appropriators, which in this case meant the water court considered evidence of whether or not the Carltons intended that the Busk-Ivanhoe water was to be stored in the Arkansas Basin. Indeed, it makes little sense to limit the water court as the majority suggests when the relevant question is the scope of the water right. Moreover, because a decree that is silent on a specific point requires the "consideration of surrounding facts and circumstances to determine the intent of parties and the meaning of the decree," In re Tonko, 154 P.3d at 405, it is necessary and appropriate for a water court to look beyond the decree and the statement of the claim to determine the intent of the appropriators.

¶84 Ultimately, "[w]e accept the water court's factual findings on appeal unless they are so clearly erroneous as to find no support in the record." Burlington Ditch, 256 P.3d at 660. Here, there was evidence in the record to properly find that the factual circumstances at the time of the 2621 Decree reflect the Carltons' intent to store the

7

water rights on the eastern slope before use for supplemental irrigation. As such, this court should accept the water court's finding that there was an intent to store on the eastern slope. I would therefore hold that because the storage was intended by the appropriators and necessary to effectuate the lawfully decreed appropriation, storage was within the scope of the appropriation.

## B. Eastern Slope Storage Did Not Expand the Decreed Water Right

¶85    Eastern slope storage did not expand the original water right because there was no injury to other water users. As the majority explains, a change application continues in a new form the rights decreed in the original appropriation and may not expand the amount of water actually used under the original decree. ISG, LLC v. Ark. Valley Ditch Ass'n, 120 P.3d 724, 732 (Colo.), as modified on denial of reh'g (Oct. 11, 2005). The statutory standard for approval of a change of water rights is: "A change of water right . . . shall be approved if such change . . . will not injuriously affect the owner of or persons entitled to use water under a vested water right or a decreed conditional water right . . . ." § 37-92-305(3)(a), C.R.S. (2016). When an appropriator diverts water within the decreed amount and removes it from the native basin, the use of the water in the basin of import has no effect on the basin of origin. See State Dep't of Nat. Res., Div. of Wildlife v. Ogburn, 570 P.2d 4, 5 (Colo. 1977) (noting that once transmountain water is exported, the basin of origin is no longer affected by the use to which imported water is put). As we observed in Ogburn, once water flows into the transmountain tunnel, one-hundred percent consumption occurs as far as the "losing" river basin is concerned, and no further injury can accrue to native appropriators (i.e., appropriators in the basin of

export).  Id. at 6 (Erickson, J., dissenting).  And appropriators of water rights in the "gaining" division cannot establish rights against the importer because they have no claims to the imported water.  Id.  Therefore, after export from the basin of origin, "no injury can result to appropriators in either division."  Id.; see also City of Florence, 793 P.2d at 154 ("[T]he appropriator of [transmountain water] may reduce or eliminate the amount of foreign water available to junior appropriators, by changing the time, place or manner in which these waters are used, even if junior appropriators are adversely affected.").

¶86    The original intent of the appropriators to store water was a factual issue reviewed by the water court in this case.  After carefully examining the evidence, the water court ultimately concluded that, although the decree did not contain a specific volumetric limit, the originally contemplated amounts of Busk-Ivanhoe water included amounts diverted for storage on the eastern slope.  Thus, Busk-Ivanhoe's proposed change neither expands the use of the water right nor injures western slope users.  Going forward, so long as Busk-Ivanhoe does not exceed its decreed average volumetric limit,[1] there is no need for a storage decree at any eastern slope reservoir.  If the volumetric limit is not exceeded, and the water rights are exercised in priority, no injury can occur.  See Twin Lakes Reservoir & Canal Co. v. City of Aspen, 568 P.2d 45, 50 (Colo. 1977) ("To us, a very important factor in this proceeding is the stipulated and decreed volumetric limitation operating annually and on a ten-year running average.").

---

[1] The water court decreed that the average volumetric limit is 2,416 acre-feet per year. This limit will likely change on remand per the majority's holding.

¶87 In sum, because an undecreed storage right was within the scope of the appropriation based on the evidence in the record regarding the intent of the original appropriation and because storage was not an expansion of the right, I would conclude that storage of the subject water rights in the basin of import was a component of the Busk-Ivanhoe System appropriation and was therefore lawful. Thus, I would find that the water court properly included the stored water in its quantification of the historic beneficial use of the Busk-Ivanhoe rights.

## II. Payment in Volumes of Water for Storage in the Arkansas Basin

¶88 As discussed above, I would hold that the storage of the Busk-Ivanhoe rights in the Arkansas River Basin was implied in the 2621 Decree. I would therefore hold that paying for this storage in volumes of water was lawful because it was part of a reasonably efficient practice to accomplish the decreed storage and subsequent use of the water rights. It is well-settled that "the right to change a water right is limited to that amount of water actually used beneficially pursuant to the decree at the appropriator's place of use." Santa Fe Trail Ranches Prop. Owners Ass'n v. Simpson, 990 P.2d 46, 54 (Colo. 1999). "Beneficial use" is defined as "the use of that amount of water that is reasonable and appropriate under reasonably efficient practices to accomplish without waste the purpose for which the appropriation is lawfully made." § 37-92-103(4), C.R.S. (2016) (emphasis added). Busk-Ivanhoe's expert testified that storage was needed to beneficially use the Busk-Ivanhoe water and that the Carltons needed to pay the fees at issue in order to store the water. The expert considered the volumes of water paid for storage as "the costs of doing business, of developing a water

10

supply that comes out of the reservoir." The water court found that this testimony was supported by the record and by the factual circumstances. Thus, I would conclude that the volumes of water paid for storage were part of the lawful beneficial use of the decreed water rights and were properly included in the quantification analysis.

### III. Conclusion

¶89 In sum, I would hold that, based on evidence in the record regarding the intent and scope of the original appropriation, storage of the subject water rights in the basin of import was a component of the Busk-Ivanhoe System appropriation and was therefore lawful. Accordingly, the water court properly included the stored water in its historic consumptive use quantification of the Busk-Ivanhoe rights. In addition, because storage of the subject water rights in the basin of import was lawful, and because payment for storage in volumes of water was a reasonable and efficient practice to accomplish the lawful use of the subject water rights under the facts of this case, the water court properly included the volumes of water paid for storage in reservoirs in the basin of import in its historic consumptive use quantification. Finally, the water court erred in excluding the years of undecreed use of the subject water rights from the representative study period and instead should have considered including any years of unjustified nonuse of the decreed water rights as zero-use years. Accordingly, I would affirm in part and reverse in part the water court's May 27, 2014 order and August 15, 2014 judgment and decree and remand to Water Division 2 for further proceedings consistent with this opinion.

11

I am authorized to state that JUSTICE HOOD joins in this dissent in part and concurrence in part.